**UNITED MINE WORKERS OF AMERICA, DISTRICT 31,** Petitioner,

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Island Creek Coal Company,** Intervenor.

**No. 88–1669.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 11, 1989.

Decided July 21, 1989.

Barbara Evans Fleischauer, for petitioner.

Joseph A. Oertel, Atty., N.L.R.B., with whom Howard E. Perlstern, Atty. and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.

J. Steven Warren, with whom Paul B. Lindemann and Harold R. Weinrich, Washington, D.C., were on the brief, for intervenor.

Before RUTH BADER GINSBURG and SENTELLE, Circuit Judges, and RE,* Chief Judge.

Opinion for the Court filed by Chief Judge RE.

RE, Chief Judge:

Petitioner, United Mine Workers of America, District 31 (Union), seeks review of a decision of the National Labor Relations Board which held that the substantive agreement of the parties, on the issue of subcontracting, relieved the employer, Island Creek Coal Company, the intervenor, of the duty to bargain further on the subject of subcontracting.

The question presented is whether the findings of the Board that Island Creek did not violate sections 8(a)(1) and (5) of the National Labor Relations Act, when it subcontracted bargaining unit work at its Tioga Strip Mine without giving the Union prior notice and an opportunity to bargain, were supported by substantial evidence. Since the decision of the Board is rational, and supported by substantial evidence, it is affirmed.

FACTS

Island Creek is a coal mining company with underground and surface mines located in various states, including the Tioga Surface Mine, situated near Craigsville, West Virginia. Island Creek has used its own employees, all of whom were represented by the Union, to mine coal and perform reclamation work at the Tioga site from 1971 to 1979. Although the mine was shut down in March 1979, on several occasions bargaining unit employees were brought to the site to do additional mining or reclamation work.

In late 1985, a short term contract on the spot coal market became available, and Island Creek decided to reopen the Tioga Mine. Island Creek, however, decided that the work should be subcontracted, and, on April 18, 1986, it entered into a contract with Magnum Mining Company, Inc. This action arises from this subcontract as to the Tioga Mine.

The subcontract required Magnum to mine the coal and deliver it to Island Creek's Gauley Eagle preparation plant. Island Creek was to pay Magnum $12.50 per ton, and provide Magnum with certain engineering services, surveys, and equipment. For an additional charge, Island Creek agreed to provide Magnum with repair services and supplies. Pursuant to Island Creek's agreement with the Union, Magnum, as "lessee-licensee" of that contract, was required to offer employment to any laid-off Island Creek employee from the Tioga Mine.

Before beginning work at the Tioga Mine, Russell Coleman, President of Mag-

* Of the United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

num, met with Jerry Miller, the Union's Vice President, to inform the Union of Magnum's agreement with Island Creek. Prior to this meeting, Island Creek had neither advised the Union of its intention to subcontract, nor offered to bargain as to its decision to subcontract the Tioga operation.

Coleman informed Miller of the terms of Magnum's contract with Island Creek. Coleman told Miller that he had no objection to becoming a signatory to the Union contract but that some exceptions to the National Bituminous Coal Wage Agreement (NBCWA) would have to be made. Specifically, Coleman stated that Magnum could not afford to pay the NBCWA required contributions to the pension plans and trust, and that he would have to be selective as to the employees he would be hiring.

On May 19, 1984, a grievance was filed by William Hayes, a bargaining unit employee of Island Creek who had worked at Tioga previously. The grievance alleged that Island Creek had "conveyed, leased, transferred or assigned its Tioga Strip to Magnum Mining" in an attempt to avoid the application of the 1984 NBCWA.

When the Union and Island Creek met to consider the grievance, the Union stated that Island Creek had violated the subcontracting provisions of the collective bargaining agreement. In order to show that the contract had been violated, the Union also requested certain pertinent information and documentation.

On June 5, 1986, the Union filed its first unfair labor practice charge. The Union alleged that Island Creek discriminated against its employees, and that it refused to bargain in good faith with the Union by "assigning, transferring or conveying its Tioga Surface Mine to another employer in order to discourage membership in [the Union], and in order to escape its obligations pursuant to the collective bargaining agreement effective between it and the [Union]." A second charge was filed on June 26, 1986, which alleged that Island Creek had "refused to bargain in good faith" with the Union "by refusing to supply information requested ... which [was] relevant and necessary to allow [the Union] ... to intelligently and effectively process a grievance concerning the Employer's Tioga Surface Mine and to intelligently and effectively police the collective bargaining agreement."

On October 15–16, 1986, a hearing was held before Administrative Law Judge William F. Jacobs. In a decision, dated June 30, 1987, ALJ Jacobs held that Island Creek violated sections 8(a)(1) and (5) of the Act by its failure "to afford the Union an opportunity to bargain over its decision to subcontract · and the effects thereof deprived the Union of its rights guaranteed under the Act."

Island Creek filed exceptions to the ALJ's decision with the Board. On July 14, 1988, the Board issued its decision dismissing that portion of the unfair labor practice complaint which alleged that Island Creek violated the Act by subcontracting the Tioga Strip Mine. The Board found that Island Creek and the Union bargained to an agreement on the subject of subcontracting in 1984, and, therefore, Island Creek "fulfilled its affirmative obligation to bargain over that subject for as long as the agreement remained in effect." *Island Creek Coal Co. v. United Mine Workers, District 31,* 289 N.L.R.B. No. 121, at 3 (July 14, 1988).

## DISCUSSION

Pursuant to section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1982), employees have "the right to self-organization, ... to bargain collectively through representatives of their own choosing, and to engage in other concerted activities...." Section 8(a) ensures compliance with those rights by making it an unfair practice for the employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [section 7] of this title;

....

(5) to refuse to bargain collectively with the representatives of his employees....

*Id.* § 158(a). Section 8(d) provides that: [T]he performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract....

*Id.* § 158(d).

We have stated that "[t]he Board is ... the agency entrusted by Congress with the responsibility of making findings in cases arising under the statute, and it is not precluded from reaching a result contrary to that of the Examiner when there is substantial evidence in support of each result." *Oil, Chem. & Atomic Workers Int'l Union, Local 4-243 v. NLRB,* 362 F.2d 943, 945-46 (D.C.Cir.1966). We have also noted "that the Board's determination that there has been no violation of the Act 'must be upheld unless it has no rational basis.'" *District 65, Distributive Workers v. NLRB,* 593 F.2d 1155, 1164 (D.C.Cir. 1978) (quoting *ILGWU v. NLRB,* 463 F.2d 907, 919 (D.C.Cir.1972)). It is clear, therefore, that the findings of the Board should not be disturbed unless they "are irrational or unsupported by substantial evidence." *Oil, Chem. & Atomic Workers,* 362 F.2d at 946.

It is agreed that subcontracting of bargaining unit work is a mandatory subject of bargaining. *See Fibreboard Paper Prod. Corp. v. NLRB,* 379 U.S. 203, 210–11, 85 S.Ct. 398, 402–03, 13 L.Ed.2d 233 (1964). There is also no dispute that the collective bargaining agreement of the parties addressed subcontracting. The question presented, therefore, is whether Island Creek fulfilled its obligation to bargain with the Union when it agreed to the detailed provisions on subcontracting which are contained in the collective bargaining agreement.

The Union concedes that there has been some bargaining on the issue of subcontracting. It contends, however, that the bargaining was not to the extent required by the statute. The Union asserts that "the mere fact that a particular subject has been mentioned in a collective bargaining agreement does not normally amount to absolute proof that the parties intended there to be no further bargaining on that subject."

According to the Union, the statutory notice and bargaining requirements come into play "before the decision to subcontract." It submits that the contractual notice becomes relevant "after the employer notified the Union [that] it was considering subcontracting and only if bargaining with the Union over possible ways that subcontracting could be performed proved unsuccessful." Hence, the Union argues that the statutory notice and bargaining requirements "coexist" with the contractual requirements, and "the contractual benefit is merely an additional safeguard to ensure compliance with the contract," rather than a "substitution of statutory rights."

The Union asserts that, had it been notified before Island Creek subcontracted with Magnum, the subcontracting issue might have been avoided. For example, the Union states that it might have made concessions on labor costs that might have avoided the need to subcontract. Finally, the Union urges that, even though the collective bargaining agreement provides for subcontracting, the duty to bargain is not extinguished. It submits that the duty to bargain can only be extinguished by an express waiver in the agreement stated in "clear and unmistakable language."

The Board found that Island Creek satisfied its statutory duty to bargain because "the parties ha[d] agreed specifically on

their respective rights and duties concerning subcontracting." *Island Creek Coal Co.*, 289 N.L.R.B. No. 121, at 3.

The Board found that the collective bargaining agreement of the parties prohibited "subcontracting that is for the purpose of avoiding other provisions of the contract or that results in laying off the Employer's employees." *Id.* at 2. The Board noted, however, that "subcontracting is permitted, provided that the subcontractor agrees to offer employment first to the Employer's qualified employees who are on layoff status." *Id.* Hence, the Board concluded that "[b]y operation of Section 8(d) [of the Act], the parties' substantive agreement relieved [Island Creek] of the duty to bargain further over the terms ... and the manner in which subcontracting could be done." *Id.* at 3.

The findings of the Board are supported by the 1984 NBCWA. Article IA, section (h) of that agreement delineates the specific guidelines and permissible boundaries of subcontracting. The agreement provides:

(1) The Employers agree that they will not lease, sublease or license out any coal lands, coal producing or coal preparation facilities where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof.

Licensing out of coal mining operations ... or sublease by any signatory operator hereto *shall not be permitted unless the licensing out does not cause or result in the layoff of Employees of the Employer.*

(2) ... Employer agrees that it will not lease, sublease, or license out coal mining operations ... covered by this Agreement, unless the conditions set forth in the following paragraph are satisfied:

Leasing, subleasing or licensing out of coal mining operations covered by this Agreement *shall be permitted where the lessee-licensee agrees that all offers of employment ... shall first be made ... to the Employer's classified and laid-off Employees....* (emphasis added)

Freedom of contract is one of the fundamental policies of the National Labor Relations Act. *See H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). The Supreme Court has stated that " 'the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " *Id.* at 106, 90 S.Ct. at 825 (quoting *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952)). Hence, "while the Board has the authority to compel enforcement of the terms of a negotiated agreement, it cannot compel enforcement of terms that are not contained in that agreement." *Hyatt Management Corp. v. NLRB*, 817 F.2d 140, 143 (D.C.Cir.1987) (citing *H.K. Porter*, 397 U.S. at 102, 90 S.Ct. at 823).

In *Fibreboard*, the Supreme Court recognized that the presence of a large number of collective bargaining agreements containing provisions for subcontracting supported a conclusion that subcontracting was a mandatory subject of bargaining. 379 U.S. at 211–12, 85 S.Ct. at 403. The *Fibreboard* case, however, did not rule out the possibility that the parties could fulfill the duty to bargain by specifically detailing the allowable limits of subcontracting in their collective bargaining agreement. As noted by Justice Stewart in his concurrence in *Fibreboard,* the question of whether an employer satisfied the duty to bargain on the issue of subcontracting "goes to the scope of the employer's duty in the absence of a collective bargaining agreement." 379 U.S. at 219, 85 S.Ct. at 407 (Stewart, J., concurring). Indeed, in *District 1199E, Nat'l Union of Hosp. & Health Care Employees v. NLRB*, 613 F.2d 1102, 1108 (D.C. Cir.1979), we specifically noted that *Fibreboard* "did not involve a contractual agreement not to subcontract out."

In this case, the Board's decision gives meaning and effect to the parties' contractual language. The collective bargaining agreement fully defined the circumstances under which subcontracting was permitted. What was required by the agreement of the parties was that "[w]ithin ten (10) days after the lease, sublease or licensing out of

any coal producing or coal preparation facilities ... the Employer shall provide notice thereof." Although the Union speculates over various scenarios which might have foreclosed subcontracting, the Union does not claim, nor is there any evidence to indicate, that Island Creek failed to satisfy the agreement's relevant conditions on subcontracting.

Were we to accept the Union's rationale, there would be no time when, under the terms of the collective bargaining agreement, Island Creek could validly subcontract work. Such a position would make the provisions on subcontracting in the collective bargaining agreement meaningless.

The Union argues that the numerous provisions and conditions in the collective bargaining agreement "illustrate the inherent need for bargaining," and that "the differing provisions on subcontracting in the agreement left many unresolved and difficult questions."

It is the Union, however, that ignores the provisions of the agreement that any question as to whether subcontracting comports with the parties' bargain on subcontracting is properly resolved through the contractual grievance procedure which culminates in arbitration. It is well established that arbitration is " 'an instrument of national labor policy for composing contractual differences.' " *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 426, 87 S.Ct. 559, 563, 17 L.Ed.2d 486 (1967) (quoting *International Harvester Co.*, 138 N.L.R.B. 923, 926 (1962), *aff'd sub nom. Ramsey v. NLRB*, 327 F.2d 784 (7th Cir.), *cert. denied*, 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964)). Furthermore, the Union has admitted that the grievance procedure is still operative, and that the grievance can be arbitrated.

Finally, the Union's argument that the Board did not consider the "clear and un-

mistakable test," as it applies to the Union's waiver of a statutory right, disregards the reasonable basis for the Board's decision. The Board's decision was not based on the Union's waiver of its rights, but, rather, on the contractual provisions on subcontracting set forth in the collective bargaining agreement. Since we agree with the Board's conclusion that the bargaining mandated by statute was not "waived," any discussion of the "clear and unmistakable test" by the Board would have been irrelevant.

It is a well-established principle of administrative law that due weight or deference should be accorded to an agency's interpretation of a statute that it is charged to administer. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed. 2d 694 (1984). It is clear that an agency's interpretation of the statutory language should be followed "unless there are compelling indications that it is wrong." *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). Since the Board's reading of the statute was permissible, we defer to its determination that the provisions on subcontracting in the collective bargaining agreement fulfilled the duty to bargain collectively imposed by Section 8(d) of the National Labor Relations Act.

CONCLUSION

Since the decision of the Board is rational, and supported by substantial evidence, it is affirmed.