**LOCAL UNION NO. 47, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, CLC, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Southern California Edison Company, Intervenor.**

No. 89–1475.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1990.

Decided March 12, 1991.

Alexander B. Cvitan, with whom Larry Abrams was on the brief, for petitioner.

William M. Bernstein, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, NLRB, was on the brief, for respondent.

Charles G. Bakaly, Jr. and Kenneth E. Johnson were on the brief for intervenor.

Before BUCKLEY, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Local Union 47, International Brotherhood of Electrical Workers, AFL–CIO, CLC, petitions for review of an order of the National Labor Relations Board dismissing an unfair labor practice complaint against Southern California Edison Company. The

complaint charged the company with violating section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1988) ("NLRA"), by refusing to bargain over the retroactivity of a wage increase during mid-contract wage reopener negotiations and by unilaterally implementing its final wage offer after bargaining to an impasse. The Board found that the union had waived its right to bargain over retroactivity by agreeing to a sixty-day retroactivity clause in its collective bargaining agreement and held that the company's unilateral implementation of its final offer in the wage reopener negotiations was justified under the rule announced in *Speedrack, Inc.*, 293 N.L.R.B. No. 128 (May 17, 1989). We deny the petition for review.

## I. BACKGROUND

Southern California Edison Company is a public utility operating in California. Local Union 47 is the collective bargaining representative for a unit of the company's employees. Between 1945 and 1987, when the case was heard by an administrative law judge, the union and the company had negotiated twenty-two successive collective bargaining contracts. This case involves the contract in effect from January 1, 1984, through December 31, 1986 ("1984 Agreement"). Article XVI, governing "Duration, Termination, and Renewal" of the 1984 Agreement, states in pertinent part:

C. Negotiations upon the proposed amendments or changes of the terms of this Agreement, as set forth in the notice of desire to amend, shall begin not later than forty (40) days prior to the expiration date or expiration of any subsequent yearly period, and shall continue until agreement is reached, and during said negotiations this Agreement shall remain in full force and effect, except that during such negotiations, subsequent to the expiration date or the expiration of any subsequent yearly period either party on sixty (60) days' notice to the other, may terminate said Contract. *Any agreement reached as a result of such negotiation with respect to any wage change shall become effective as of the anniversary termination date of this Agree-*

*ment, provided such retroactivity does not exceed sixty (60) days.*

D. Either party, by a notice in writing sixty (60) days prior to December 31, 1985, may reopen Article XII, Wages, only for the purpose of negotiating general across-the-board changes in the basic straight time rate of pay for the job classifications set forth in Exhibit A. *Agreement reached as a result of such reopening shall become effective as of January 1, 1986, providing such retroactivity does not exceed sixty (60) days.*

Appendix of Exhibits ("App. Ex.") 937–38 (emphasis added).

The parties included Section C of Article XVI in their original 1945 contract, and it has appeared in substantially the same form in each of the successor contracts. A wage reopener provision essentially identical to Section D has appeared in all but one of the contracts since 1953.

Article VIII of the 1984 Agreement provides:

The waiver of any breach or condition of this Agreement by either party does not constitute a precedent for any further waiver of such breach or condition.

App.Ex. 906. All twenty-two contracts have included this waiver limitation.

The parties agree that the intent behind the two wage retroactivity clauses in Article XVI is the same; the bargaining history of Section C's retroactivity provision is therefore relevant to the interpretation of Section D. The retroactivity provision in Section C was proposed and adopted at a June 6, 1945, bargaining session before Commissioner Harry C. Malcom of the United States Department of Labor Conciliation Service. The union initially proposed an automatic guarantee of full retroactivity: "Any agreement reached with respect to wages shall become effective as of the anniversary termination date of this agreement." App.Ex. 268. During negotiations over this proposal, Commissioner Malcom made the following suggestion:

MR. MALCOM: ... Why don't you limit these retroactivities to 60 days? If

your negotiations go ... more than 60 days beyond the expiration date, then your retroactivity would only be 60 days; and it has a tendency in that way to make both sides get in there and pitch.

MR. KEETON [union representative]: That sounds reasonable.

MR. MALCOM: If you leave the retroactivity wide open, it will be charged, whether rightfully or not, that you are stalling, because you know you are going to get it back, anyway. If you don't have it in there, the Company will be charged with stalling, because they know they are not going to have to give it back to you. So if you say that any increase in wages negotiated would be effective as of the anniversary date, provided it is not more than 60 days, then you are limited to 60 days; and it has a tendency to help things move along. It makes for a very healthy situation. In this instance, you actually have 120 days there that you could negotiate in, if you wanted to; and if you can't reach an agreement in 120 days, then you can't reach an agreement at all.

MR. KENYON [company representative]: How would that thing be limited, now? Show me how you would write it, how it would read.

. . . .

MR. MALCOM: I have no pride of authorship. I was just giving you the idea. You can word it any way you want to. . . . "Any agreement reached with respect to wages shall be retroactive to the anniversary date of this agreement, provided such retroactivity is not more than 60 days." You could make it something like that. That's just a rough idea.

MR. KENYON: In other words, if we argued ... on into June or July, we would have 60 days of retroactivity only?

MR. KEETON: That's right.

MR. MALCOM: If you started to negotiate 60 days before the anniversary date, you would have 60 days after that.

MR. KENYON: Without penalty?

MR. MALCOM: Without penalty.

MR. KENYON: To the boys?

MR. MALCOM: Yes. . . .

App.Ex. 271–73. The parties agreed with Commissioner Malcom's suggestion and adopted substantially the same retroactivity language that appears in Article XVI(C) of the 1984 Agreement.

The parties next discussed this provision during contract renewal negotiations in 1947. The principal negotiators for the company and the union in that year had participated in the adoption of Section C less than two years before and were presumably familiar with its purpose. During bargaining sessions in February 1947, the union expressed concern that an agreement could not be reached before March 2, the end of the sixty-day period. The company reminded the union that they had adopted the sixty-day provision as "a coercive factor on both teams" that would force them to come to terms, and the union negotiator agreed. App.Ex. 299–300. The company emphasized that the parties had signed "a cold-blooded deal" and that the union could not reject the existing contract and get full retroactivity. *Id.* at 303–04.

After the March 2 deadline passed without agreement, the parties discussed whether to include Section C in the successor contract. The union objected to the sixty-day period and pressed for full retroactivity. The company acknowledged that Section C had failed to force a timely agreement that year but rejected the idea of full retroactivity. The company reiterated that in 1945 both sides had agreed that there needed to be "a reasonable period or limitation on the amount of retroactivity, so that you do not get into the bind where somebody has a right to just sit there ... and have no pressure on him." *Id.* at 308, 315.

Finally, on April 30, 1947, the company offered a fully retroactive wage increase. It stated that it was "willing to forego the technical right that we have under the contract to limit the retroactivity to 60 days" so that union members and nonmembers would receive the same wages under the new agreement. *Id.* at 334. The union questioned the company's willingness to pay full retroactivity without putting it in the contract and suggested, "You still want

to use the same leverage that you have had this year." *Id.* The company representative replied, "That's right. We still think that is a good leverage. It didn't work this year, but that is no reason why" it should not work the next. *Id.* at 334–35. The company justified the seeming contradiction in its positions by stating, "We are trying now to make a deal." *Id.* at 335. The parties eventually signed an agreement on May 23 that provided for wage increases retroactive to January 1—141 days of retroactivity.

In the many years that followed, contract renewal talks often lasted well past the sixty-day deadline. Until 1978, the company agreed to make each negotiated wage increase fully retroactive. It usually did so in exchange for the union's approval of management's latest offer. On at least one occasion, the company made it clear that "in waiving this retroactivity we do not feel that we have established a precedent," and the union concurred. *Id.* at 405. From time to time, both sides expressed frustration with the sixty-day rule and attempted to eliminate it—the company proposed to leave the issue of retroactivity open for negotiations; the union sought a guarantee of full retroactivity. These efforts were never successful.

The 1978 negotiations were the longest ever. In June 1978 the company warned the union that if its members rejected the company's latest proposal, which the union supported, the company might not agree to full retroactivity. After the membership voted down the proposal, the company announced it would "stop the retroactivity clock on August 4th, and after August 5th, there will be one day removed from retroactivity for every day that we go beyond August 5th." *Id.* at 552. Not surprisingly, on August 4 the union membership ratified the company's contract proposal and received a fully retroactive wage increase.

The bargaining history under Article XVI(D) is less eventful. The parties entered into wage reopener negotiations twelve times between 1954 and 1979. The first time these reopener talks extended beyond the sixty-day deadline was in 1979 when the company agreed to full retroactivity without discussing the effect of the limitation.

Beginning with the 1980 bargaining sessions, the company sought to roll back the retroactivity of wage increases. It proposed to subtract one month of retroactivity in each round of contract negotiations until, it was hoped, retroactivity would eventually be within the sixty-day limits provided for in Article XVI. The roll-back effort did the trick. Except for the 1986 wage reopener negotiations at issue here, the union and the company resolved each of their post–1979 negotiations within the gradually shrinking periods of retroactivity imposed by the company. Indeed, in 1987 the parties reached agreement on a successor contract within sixty days after termination of the 1984 Agreement.

The union initiated the 1986 wage reopener negotiations on October 15, 1985. A company spokesman informed the union that 1986 was the year the company would adhere to the sixty-day limit. In December 1985, the company made its final offer—a wage increase of 4.5 percent. At a January 1986 bargaining session, company negotiators stated that they did not intend to pay a retroactive wage increase beyond the March 2 cut-off and urged the union to submit the company's final offer to its members for a vote. The union responded that it viewed retroactivity as a company problem that should not be injected into the bargaining process.

From March 4 on, the company refused to bargain over retroactivity. On July 31, without the union's consent, the company implemented its 4.5 percent offer, with retroactive payment limited to the period January 1 through March 2 plus interest. Thereafter, the union filed charges and the General Counsel brought an unfair labor practice complaint against the company. In the subsequent hearing before the administrative law judge ("ALJ"), the parties stipulated that if the company's refusal to bargain over retroactivity during the 1986 wage reopener negotiations was legal, the negotiations had reached a genuine im-

passe on July 31, 1986, when the company unilaterally implemented its final offer.

The ALJ ruled that the company's refusal to negotiate did not violate the NLRA because the union had waived its right to bargain over retroactivity. He found that Article XVI(D) clearly and unambiguously established the maximum retroactivity the company was obligated to pay. He also found that the collective bargaining record and the manner in which the parties had administered the sixty-day provisions indicated that Section D was unmistakably intended to be a cap on retroactivity. Given the clear evidence of intent found in the bargaining history, he concluded that the parties' agreement to limit payment to sixty days encompassed the further agreement that the company was privileged to refuse to bargain over retroactivity beyond that period. The ALJ also ruled that the company was privileged under section 8(d) of the NLRA (which deals with the parties' obligations to bargain collectively) to implement its final wage offer unilaterally.

The Board affirmed and adopted the ALJ's decision and order. *Southern Calif. Edison Co.*, 295 N.L.R.B. No. 28 (June 15, 1989). On the question of unilateral implementation, the Board adopted the ALJ's conclusion based on two intervening decisions, *Speedrack, Inc.*, 293 N.L.R.B. No. 128 (May 17, 1989), and *Hydrologics, Inc.*, 293 N.L.R.B. No. 129 (May 17, 1989). In these decisions the Board had held that

> when the parties have terminated a contract provision through the exercise of a wage reopener and have complied with the procedural requirements of Section 8(d), they are free, after the 60–day [grace] period specified in Section 8(d) has elapsed, to exercise all the prerogatives normally available to them during bargaining, namely, to strike or lock out and to implement final proposals on reopened subjects after impasse has been reached.

295 N.L.R.B. No. 28, at 2. The Board observed that there was no allegation that the section 8(d) procedural requirements had not been met in this case and that, at any rate, the evidence showed they had been. *Id.*

The union petitions for review of the Board's decision. This court has jurisdiction under section 10(f) of the NLRA, 29 U.S.C. § 160(f).

## II. DISCUSSION

### A. Refusal to Bargain

■ Sections 8(a)(5) and 8(d) of the NLRA impose a duty on an employer "to bargain collectively with the representatives of his employees" over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). The union may exercise its right to bargain about a particular subject by negotiating for a provision in the collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject. *See UMW, Dist. 31 v. NLRB*, 879 F.2d 939, 944 (D.C.Cir.1989); *IBEW, Local 1466 v. NLRB*, 795 F.2d 150, 155 (D.C.Cir.1986). Alternatively, through the collective bargaining process, a union may waive the employees' statutory right to bargain over a term or condition of employment. *NLRB v. United Techs. Corp.*, 884 F.2d 1569, 1575 (2d Cir.1989); *see Local 1395, IBEW v. NLRB*, 797 F.2d 1027, 1029 (D.C.Cir.1986).

■ When the question is one of waiver, the union's intent to relinquish its statutory rights "must be clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). To this end, the words of the collective bargaining contract are evidence of the parties' intentions, but bargaining history is also considered when it is crucial to understanding the purpose behind the contractual language. *See Local 1395*, 797 F.2d at 1036. The Board's factual findings on matters of intent are conclusive if supported by substantial evidence on the record as a whole. *See* 29 U.S.C. § 160(f); *Local 1395*, 797 F.2d at 1030.

■ We accord no special deference, however, to ultimate legal conclusions that rest on the Board's interpretation of a collective bargaining contract. *See Local*

*1395,* 797 F.2d at 1030; *see also Idaho Statesman v. NLRB,* 836 F.2d 1396, 1401 (D.C.Cir.1988). Thus we apply a *de novo* standard of review when interpreting the contract itself. *See Local 1395,* 797 F.2d at 1030–31. If the parties have agreed to a contractual provision that limits their rights with regard to a term or condition of employment, we will give full effect to the plain meaning of such provision. Where the contract fully defines the parties' rights as to what would otherwise be a mandatory subject of bargaining, it is incorrect to say the union has "waived" its statutory right to bargain; rather, the contract will control and the "clear and unmistakable" intent standard is irrelevant. *See UMW, District 31,* 879 F.2d at 944.

■ In its petition the union argues that the factors considered by the Board, either alone or taken together, do not constitute substantial evidence that the union clearly and unmistakably waived its statutory right to bargain over the retroactivity of wage increases. The union contends that the language of Article XVI(D) addresses only the effective date and amount of retroactivity if the parties reach agreement within the sixty-day period and is silent on the amount payable when agreement is reached after March 2, 1986. According to this reading, Article XVI(D) is a simple guarantee of sixty days of retroactivity that leaves the question of additional retroactivity open for negotiation. To the union, the 1945 collective bargaining record is merely evidence of the company's contractual obligation to pay sixty days of retroactivity, not its obligation to bargain about additional retroactive payments. The decades of subsequent bargaining history do not establish a waiver, the union argues, because of the many instances when the company bargained over retroactivity in excess of sixty days without claiming any privilege not to do so.

We agree with the Board's interpretation of Article XVI. Section D clearly provides that any wage change resulting from the reopener negotiations was to be retroactive to January 1, 1986, but that the amount of retroactivity the company was obligated to

pay could not exceed sixty days. If an agreement had been reached on the fifteenth day of January, the company would have been obligated to pay fifteen days of retroactivity; if agreement had been reached on the Fourth of July, only sixty days would have been owed. We reject the union's strained reading of the contract and its contention that Article XVI(D) is ambiguous with regard to the company's obligations toward retroactivity after March 2. The company had no such obligations. The Board was correct that the bargained-for sixty-day cap eliminated any duty the company would otherwise have had to discuss additional retroactivity.

Given the plain import of Article XVI(D), we are not dealing with a case of waiver. *See UMW, District 31,* 879 F.2d at 944. The union fully exercised its right to bargain over the retroactivity of the 1986 wage increase when it agreed to include Section D in the 1984 Agreement. The company "merely implemented" the limitation that the parties had adopted when they signed the contract. *IBEW, Local 1466,* 795 F.2d at 155. Hence it was unnecessary for the Board to find a clear and unmistakable intent by the union to relinquish any statutory rights. *See UMW, District 31,* 879 F.2d at 944.

While we have no occasion to consider the Board's findings on the waiver question, we do note that our interpretation of Article XVI is reinforced by the Board's recitation of the bargaining record. The 1945 and 1947 negotiation sessions demonstrate that in adopting the sixty-day provision in Article XVI(C), the parties intended to impose a cap on retroactivity; and we agree with the Board that it is "perfectly clear" that both sides understood the company could refuse to bargain over further retroactivity. *Southern Calif. Edison Co.,* 295 N.L.R.B. No. 28, ALJ Decision at 39.

In 1945, when the sixty-day provision was first proposed, Commissioner Malcom explained its meaning: "If your negotiations go ... more than 60 days beyond the expiration date, then your retroactivity would only be 60 days...." App.Ex. 271. The purpose was to pressure both sides to

come to terms within the grace period. *See id.* The spokesman for the union apparently accepted this idea when he responded, "That sounds reasonable." *Id.* The company's negotiator made sure he understood the point: "[I]f we argued ... on into June or July, we would have 60 days of retroactivity only?" The union representative assured him, "That's right." *Id.* at 272.

The 1945 record also indicates that the sixty-day period was not meant to be a guaranteed minimum that would leave unaffected the union's right to more retroactivity. Commissioner Malcom emphasized to the parties that under his suggestion, they would have sixty days following the anniversary date in which to bargain "[w]ithout penalty" "[t]o the boys," presumably referring to the company's employees. *Id.* at 272–73. The clear implication is that if negotiations dragged on past the deadline, the employees would be penalized with a loss of retroactivity. Contrary to the union's contention, the commissioner's observation that the parties would actually have 120 days in which to negotiate, *id.* at 272, 273, raises no ambiguity; he was simply stressing the fact that the agreement permitted negotiations to be initiated sixty days before the anniversary date. *See id.* at 272.

Statements made during the renewal negotiations in 1947 further verify that the contract means what it says. The company's spokesman (who had represented the company when it agreed to Article XVI(C) in 1945) described the sixty-day provision as "a limitation on the amount of retroactivity." *Id.* at 315. This same spokesman declared that although the company was willing to offer full retroactivity that year, the company had a "technical right ... under the contract to limit the retroactivity to 60 days." *Id.* at 334. The company could have exercised that right by refusing to discuss the subject of retroactivity.

The company's practice of agreeing to full retroactivity as a quid pro quo for union endorsement of its proposals does not negate this clear contractual right. We agree with the Board that under the terms of Article VIII, the company's willingness

in given years to pay fully retroactive wage increases could not operate as a waiver of its right to limit retroactivity in subsequent years. *See* 295 N.L.R.B. No. 28, ALJ Decision at 36. Article VIII provides that "[t]he waiver of any ... condition of this Agreement ... does not constitute a precedent for any further waiver of such ... condition." *Id.;* App.Ex. 906. The union urges otherwise, but the sixty-day proviso in Article XVI(D) is plainly a "condition" attached to the employees' contractual right to retroactivity and therefore falls within the Article VIII waiver limitation.

### B. Unilateral Implementation

■ It is an unfair labor practice, under section 8(a)(1) and (5) of the NLRA, for an employer unilaterally to modify a term or condition of employment in a collective bargaining contract during the term of the contract. 29 U.S.C. § 158(a)(1) & (5); *see, e.g., Allied Chem. & Alkali Workers, Local 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 159, 92 S.Ct. 383, 387, 30 L.Ed.2d 341 (1971); *see also* 29 U.S.C. § 158(d). Where the parties have begun negotiations over renewal of an expiring contract, however, the employer may unilaterally implement a proposal after bargaining to a genuine impasse. *See Teamsters Local 175 v. NLRB,* 788 F.2d 27, 30 (D.C.Cir.1986).

Section 8(d) provides that no party may terminate or modify a collective bargaining contract without first notifying the other party of the proposed modification prior to the contract's expiration date; offering to meet and confer with the other party to negotiate a new or modified contract; notifying federal and state mediation services if no timely agreement is reached; and honoring all terms of the existing contract for sixty days after notice is given or until the expiration date of the contract, whichever is later. 29 U.S.C. § 158(d).

Where the contract contains a reopener clause, the Supreme Court has held that a union may strike in support of demands made during reopener negotiations, provided the procedural requirements of section 8(d) are satisfied. *NLRB v. Lion Oil Co.,* 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331

(1957). The Court held that an "expiration date" within the meaning of section 8(d)(1) and (4) includes the date when a collective bargaining contract is subject to modification pursuant to a reopener. *Id.* at 289–90, 77 S.Ct. at 334. It would be "anomalous," the Court believed, to recognize a duty to bargain over contractual terms that are subject to modification while at the same time depriving the union of the strike threat needed to back up its bargaining position. *Id.* at 290–91, 77 S.Ct. at 334–335.

In its *Hydrologics* and *Speedrack* decisions, the Board extended the reasoning of *Lion Oil.* In *Hydrologics* the Board held that a union's right to strike during mid-term reopener negotiations is not waived by a general no-strike clause that does not address the reopener situation. 293 N.L. R.B. No. 129, at 6–10. According to the Board, the underlying conclusion of *Lion Oil* is that the NLRA and its legislative history "may be read as placing reopener bargaining and bargaining when no contract is in effect on equal footing with respect to the availability of economic weapons." *Id.* at 6.

In *Speedrack* the Board applied this reasoning to the rights of the employer following an impasse in wage reopener negotiations. The Board held that once negotiations are properly reopened, the NLRA permits an employer unilaterally to implement his final offer after genuine impasse is reached (just as he may do in post-expiration negotiations), absent a clear agreement between the parties constraining the right to unilateral implementation. 293 N.L.R.B. No. 128, at 4–7. The Board concluded that

> the policies of the [NLRA] with regard to collective bargaining make it reasonable to read a contract reopener provision as permitting the parties to respond to disputes over reopened subjects by resort to the courses of action normally allowed them when a contract has expired, so long as the procedural requirements of Section 8(d) are met. By agreeing to a reopener, the parties manifest their agreement to permit such measures un-

less they include language to the contrary.

*Id.* at 9–10 (footnote omitted).

■ The union argues, first, that the 1984 Agreement by its terms provided wage rates for the duration of the contract and did not allow the company to modify them unilaterally. The union focuses on Article XVI(A), which fixes the term of the contract, App.Ex. 937; on Article XII(A), which provides that initial wage rates were effective "during the term of this Agreement, except as hereinafter provided in Article XVI," App.Ex. 920; and on Article XVI(D) itself.

The union contends that by providing for reopening "only for the purpose of *negotiating* ... changes" in wage rates as of January 1, 1986, App.Ex. 938 (emphasis added), Section D does not terminate the wage rates on that date or on the date impasse is reached. Furthermore, the fact that Section D states that *"[a]greement* reached as a result of such reopening shall become effective as of January 1," App.Ex. 938 (emphasis added), indicates, according to the union, that a change in wages could become effective only upon the consent of both parties. Thus, it is argued, the wage reopener simply makes the mid-contract modification of wages a mandatory subject of bargaining to which the statutory enforcement rights of section 8(d) apply.

We see nothing in these provisions that evidences a "clear agreement" to preclude use of economic leverage should reopener negotiations reach a genuine impasse. To the contrary, the agreement was that wage rates were subject to renegotiation at either party's request prior to the expiration of the overall contract. There is no express indication that during reopener negotiations, the parties would not enjoy the usual full bargaining rights. *Cf. Lion Oil,* 352 U.S. at 293–94, 77 S.Ct. at 336 (examining collective bargaining contract for evidence of such agreement). Use of the word "agreement" in Article XVI(D) might simply refer to the anticipated result of negotiations; certainly, this word alone does not indicate an intent to leave the

company empty-handed in bargaining for a wage modification.

■ Having seen no controlling language in the 1984 Agreement, we turn to the validity of *Speedrack.* There are two aspects of *Speedrack,* and they require different treatment. The first is a rule of contract interpretation: When a collective bargaining contract incorporates a midterm reopener provision, it is presumed (absent a clear agreement to the contrary) that the parties intend to allow resort to economic weapons once an impasse is reached in the reopener negotiations. 293 N.L.R.B. No. 128, at 3–4, 6–7. This rule of thumb for contract construction is subject to our *de novo* review. The second aspect of the Board's decision—its ruling that an employer does not violate the NLRA by implementing a wage offer after bargaining to impasse in a reopener—represents an interpretation of the statute by the agency charged with its administration. As such, this aspect of *Speedrack* must be accorded deference so long as it is based on a permissible construction of the NLRA. *See Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *UMW 31,* 879 F.2d at 944.

The union argues that the *Speedrack* presumption is contrary to the policy of the statute. According to the union, we may not presume that the parties to a reopener clause intend to terminate a reopened provision; instead, unless it is otherwise agreed in the contract, we should presume that the parties simply intend to open the provision for further negotiations while leaving the existing terms and conditions fully effective until mutual agreement on a modification is reached. The union also argues that *Speedrack* is inconsistent with *Lion Oil* because the Court in *Lion Oil* did not conclude that the exercise of a reopener clause is a termination of the collective bargaining agreement; rather, the Court merely determined that the union's midterm strike did not violate the procedural requirements of section 8(d) and was not a breach of contract.

We fail to see any inconsistency between *Speedrack* and *Lion Oil.* The latter recognized that under section 8(d) parties have a duty to bargain over the modification of reopened contract terms. 352 U.S. at 290–91, 77 S.Ct. at 334–35. Along with the duty to bargain comes the right to insist that the other party not ignore its bargaining obligations. The Court cited with favor a Senate report on the Taft–Hartley Act that stated that section 8(d) "contemplate[s] the right of either party to insist on changes in the contract if they have so provided." *Id.* at 291, 77 S.Ct. at 335 (quoting S.Rep. No. 986, 80th Cong., 2d Sess. (III) 62 (1948)). The Court agreed with the conclusion that where the party in question is the union, such a right "would be an empty one without the right to strike." *Id.*

We believe the Board is correct in applying the same interpretation to the rights of the employer. As the Board concluded, the employer's obligation to bargain over a reopened wage term carries with it the right to implement a final wage offer upon genuine impasse. *See Speedrack,* 293 N.L.R.B. No. 128, at 4–5. It is fair to presume that where the parties have provided for the reopening of a contract term, they contemplate that once the reopener is initiated, real bargaining—with its attendant rights and obligations—will follow. *See id.* at 3–4. We agree that curtailing the right of the employer to implement his wage offer "would turn reopener bargaining into little more than a charade that would barely differentiate it from the kinds of discussion that may lawfully occur even in the absence of a reopener." *Id.* at 4. Hence we will adopt the *Speedrack* presumption for purposes of interpreting midterm reopener provisions in collective bargaining contracts.

The union claims that its contrary approach to the interpretation of reopeners is supported by *Colorado–Ute Elec. Ass'n,* 295 N.L.R.B. No. 67 (June 15, 1989), *pet. for review pending,* No. 89–9545 (10th Cir.), in which the Board allowed an employer to bargain to impasse but not to implement his final offer unilaterally. *Colorado–Ute* does not conflict with our application of the *Speedrack* presumption to the 1984 Agreement. In *Colorado–Ute,* the

Board ruled that an employer could not unilaterally implement a wage proposal involving merit increases—as opposed to flat wage rate increases—because the Union had not waived its statutory right to be consulted about the timing and amount of individual merit determinations. *See id.* at 9–10. Here the union and the company expressly agreed in Article XVI(D) that wage rates could be changed across the board at the insistence of either party. There is no secondary right involved, either statutory or contractual, that is analogous to the merit-pay consultation right at issue in *Colorado–Ute.*

We also conclude that the Board's interpretation of the NLRA is reasonable, and we defer to it. The union argues for a distinction between the right to strike, involved in *Lion Oil* and *Hydrologics,* and the employer's right of unilateral implementation upon impasse. The union contends that the Board was wrong when it stated that "the same statutory policies" apply to both forms of economic leverage, *Speedrack,* 293 N.L.R.B. No. 128, at 6. While unions enjoy a statutory right to strike under the NLRA, employers, it is argued, have no parallel right of unilateral implementation. According to the union, the ability to take unilateral action derives from the axiom that the employer's duty to bargain does not imply a veto power for the union, *see Colorado–Ute,* 295 N.L.R.B. No. 67, at 8–9, and is simply a vestige of the employer's "pre-NLRA right" to manage his own business affairs absent any legal constraint to do otherwise. Brief for Petitioner at 47.

Even if valid, this distinction does not undermine the application of *Speedrack* in the present case. The central thrust of both *Hydrologics* and *Speedrack* is to conform bargaining rights in the reopener context with those in the contract expiration context. For that purpose it is not crucial whether the particular rights involved have their origins in the NLRA, so long as they are consistent with or recognized in the statute. The employer's right of unilateral implementation upon impasse has long been recognized as consistent with the NLRA. *E.g., American Fed'n of T.V. & Radio Artists v. NLRB,* 395 F.2d 622, 624 (D.C.Cir.1968). We therefore decline to overrule the Board's interpretation of the NLRA, as it applies to the facts here.

We emphasize, however, that this case, like *Speedrack,* involves only the employer's right to implement a final wage offer. The Board indicated that once the parties exercise a wage reopener and section 8(d) is satisfied, an employer would also be free to resort to a lockout. *Southern Calif. Edison Co.,* 295 N.L.R.B. No. 28, at 2. We express no opinion on the employer's right *vel non* to lock out during a reopener.

For the reasons discussed above, the Board's ruling on unilateral implementation is also affirmed.

### III. CONCLUSION

The Board properly concluded that Southern California Edison Company did not commit an unfair labor practice in refusing to bargain over the retroactivity of the 1986 wage increase. Under the express terms of the 1984 Agreement, the company was obligated to pay up to sixty days of retroactivity; beyond that, the company had no obligation to discuss the subject. The Board's conclusion that the union waived its bargaining rights by agreeing to Article XVI(D) was unnecessary in light of our reading of the contract.

We also conclude that the Board properly dismissed charges that the company committed an unfair labor practice when it unilaterally implemented its final wage offer. Nothing in the contract reflects a clear agreement between the parties to limit the company's right of unilateral implementation during reopener negotiations. Because it is undisputed that those negotiations had reached a genuine impasse, the rule in *Speedrack* controls. We concur in that aspect of *Speedrack* that represents a rule of contract construction; to the extent *Speedrack* reflects the Board's interpretation of the NLRA, we find that interpretation reasonable. Accordingly, the petition for review is

*Denied.*