NO. 4-06-0083     Filed 5/2/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE STATE OF ILLINOIS, DEPARTMENT OF | ) | Direct Appeal from |
| CENTRAL MANAGEMENT SERVICES (DEPARTMENT | ) | Illinois Labor |
| OF CORRECTIONS), | ) | Relations Board, |
|     Petitioner-Appellant, | ) | State Panel |
|     v. | ) | |
| THE STATE OF ILLINOIS, LABOR RELATIONS | ) | |
| BOARD, STATE PANEL; JACKIE GALLAGHER, | ) | No. S-CA-03-002 |
| MICHAEL HADE, CHARLES HERNANDEZ, REX | ) | S-CA-03-052 |
| PIPER, and LETITIA TAYLOR, the Members | ) | S-CA-03-054 |
| of Said Board and Panel in Their | ) | S-CA-03-056 |
| Official Capacity Only; and THE | ) | S-CA-03-064 |
| AMERICAN FEDERATION OF STATE, COUNTY | ) | S-CA-03-068 |
| AND MUNICIPAL EMPLOYEES, COUNCIL 31, | ) | S-CA-03-090 |
|     Respondents-Appellees. | ) | S-CA-03-092 |

_____

JUSTICE COOK delivered the opinion of the court:

This case arises out of an impasse in negotiations between petitioner, the State of Illinois Department of Central Management Services (Department of Corrections) (hereinafter CMS), and respondent American Federation of State, County, and Municipal Employees, Council 31 (hereinafter AFSCME). The negotiations involved the impact on security employees of CMS's closure of several correctional facilities. AFSCME was the exclusive representative of the employees at issue. Both parties agree that the employees in question are "security employees" as defined by the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(p) (West 2002)). Because security employees are afforded access to certain dispute-resolution procedures under section 14

of the Act, both parties often refer to the security employees as section 14 employees (5 ILCS 315/14 (West 2002)). This case centers around the scope of section 14 dispute-resolution procedures afforded to section 14 employees, specifically whether section 14 authorizes "midterm interest arbitration," i.e., arbitration in the middle of a contract as opposed to its beginning or end.

On December 21, 2005, respondent Illinois Labor Relations Board (Board) issued a decision and order finding that (1) section 14 authorizes "interest arbitration" for disputes involving section 14 employees in "midterm" disputes and not merely in "initial" or "successor" disputes; and (2) the collective-bargaining agreement relevant to this case did not contain a waiver of the statutory right to midterm interest arbitration for security employees. In keeping with these findings, the Board held that CMS violated sections 10(a)(1) and 10(a)(4) of the Act when it refused to proceed to impasse resolution pursuant to section 14 of the Act (5 ILCS 315/10(a)(1), (a)(4) (West 2002)). The Board ordered CMS to cease and desist from refusing to proceed to impasse resolution pursuant to section 14. The Board did not allow immediate access to interest arbitration but instead ordered the parties to design a process for the resolution of the dispute under section 14(p), with any disagreements subject to the Board's compliance (5 ILCS 315/14(p) (West 2002)).

- 2 -

CMS appeals the Board's findings.  American Federation of State, County, and Municipal Employees, Council 31, 22 Pub. Employee Rep. (Ill.) par. 10, Nos. S-CA-03-002, S-CA-03-048, S-CA-03-052, S-CA-03-054, S-CA-03-056, S-CA-03-064, S-CA-03-068, S-CA-03-090, S-CA-03-092 (Illinois Labor Relations Board, State Panel, December 21, 2005) (hereinafter 22 Pub. Employee Rep. (Ill.) par. 10). We affirm.

## I. BACKGROUND

At all times relevant, a bargaining agreement between CMS and AFSCME was in effect.  The bargaining agreement was extensive in nature and was part of a long-standing relationship of bargaining agreements between the parties. The bargaining agreement contained a general no-strike provision, which applied to all employees, both section 14 security employees and nonsection 14 employees.  In contrast, by statute, section 14 employees are generally prohibited from striking and nonsection 14 employees generally have the right to strike.  5 ILCS 315/17 (West 2002) (general right-to-strike provision).  As is required when a bargaining agreement contains a no-strike clause, the bargaining agreement also contained a grievance-arbitration provision, which applied to all employees in the bargaining unit and provided for final and binding arbitration of disputes concerning the administration or interpretation of the bargaining agreement.  See 5 ILCS 315/8 (West 2002) (bargaining agreements that contain no-

strike clauses must also contain grievance-arbitration provisions). The bargaining agreement also contained a memorandum of understanding in its appendix, which provided that, within 60 days of the employer's announcement of a correctional-facility closure, the parties "agree to negotiate over such matters that may impact upon employees *** on questions of wages, hours[,] and other conditions of employment." Accordingly, in 2002, CMS and AFSCME entered into negotiations concerning the impact that the closure of nine correctional facilities would have on security employees.

The parties were unable to reach full agreement on several points concerning the closure of the facilities. The subjects on which the parties reached impasse included issues relating to the filling of vacancies and transfer, recall, and seniority rights of the affected employees. It appears that these issues were not specifically covered by the bargaining agreement. AFSCME requested that the parties enter into "interest arbitration" to resolve the remaining issues. AFSCME thought that it had a statutory right to interest arbitration under section 14 of the Act, entitled "Security Employee, Peace Officer[,] and Fire Fighter Disputes," which delineates interest-arbitration procedures of security employees (5 ILCS 315/14 (West 2002)). CMS refused to enter into interest arbitration, and implemented its "final offer" as determined by the 2002 negotia-

tions, including all the terms upon which the parties were unable to agree.

In the July through October 2002 period, AFSCME filed nine unfair-labor-practice charges against CMS, each alleging that CMS violated sections 10(a)(1) and 10(a)(4) of the Act because CMS refused to proceed to interest arbitration (5 ILCS 315/10(a)(1), (a)(4) (West 2002)). These sections state that an employer commits unfair labor practice under the Act when it restrains an employee's ability to exercise the rights guaranteed by the Act (5 ILCS 315/10(a)(1) (West 2002)) and when it "refuse[s] to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit, including, but not limited to, the discussing of grievances with the exclusive representative" (5 ILCS 315/10(a)(4) (West 2002)). AFSCME's nine complaints were ultimately consolidated into one. AFSCME withdrew No. 5-CA-03-048. In June 2004, the case went before an administrative law judge (ALJ), who found in favor of AFSCME. The ALJ ordered the parties to proceed to "interest arbitration" under section 14. American Federation of State, County, & Municipal Employees, Council 31, 22 Pub. Employee Rep. (Ill.) par. 10, Nos. S-CA-03-002, S-CA-03-052, S-CA-03-054, S-CA-03-056, S-CA-03-064, S-CA-03-068, S-CA-03-090, S-CA-03-092 (Illinois Labor Relations Board, State Panel, ALJ recommended decision and order, April 25, 2005).

CMS filed exceptions, and the case then went before the Board. Both parties stipulated that there was "no issue" as to whether this dispute should be "deferred" to the grievance-arbitration procedures contained in the bargaining agreement. By this, we presume the parties meant that the existence of the grievance-arbitration provision contained within the bargaining agreement did not (1) require a finding that the current dispute should be resolved through the contractual grievance-arbitration procedures rather than the statutory procedures, or (2) preclude the Board from addressing whether the Act also authorized midterm interest arbitration. AFSCME stated in closing that the issue of whether good-faith bargaining had occurred was a statutory issue and was not to be determined by the contractual grievance-arbitration procedures. CMS argued that AFSCME did not have a statutory right to midterm interest arbitration because, according to CMS's interpretation of the statute, section 14 gave security employees the right to interest arbitration only for disputes arising during the formation of "initial" or "successor" contracts (i.e., comprehensive bargaining agreements), not for "midterm" disputes (i.e., an ancillary dispute arising while the bargaining agreement is still in effect) that were not the subject of contract "reopeners" (i.e., where the parties agree to "reopen" the agreement or designated part of the agreement). In the alternative, CMS argued that AFSCME contractually waived any

- 6 -

statutory right to midterm interest arbitration.

The Board found that the Act allowed for midterm interest arbitration and declined to follow CMS's narrow interpretation of section 14. Instead, the Board relied largely on the general policy language in section 2 of the Act, which states that all collective-bargaining disputes involving security employees shall be submitted to impartial arbitrators (5 ILCS 315/2 (West 2002)). The Board also held that AFSCME did not contractually waive its statutory right to access midterm interest arbitration in this matter. The Board ordered CMS to desist from "[r]efusing to proceed to impasse resolution, pursuant to [s]ection 14 of the Act." 22 Pub. Employee Rep. (Ill.) par. 10, at 28. The Board's decision differs slightly from that of the ALJ because the ALJ ordered the parties to proceed to interest arbitration. However, the Board stated that "[s]ection 14 of the Act does not contemplate immediate access to interest arbitration, without some sort of mediation attempt, unless the parties agree to such a process." 22 Pub. Employee Rep. (Ill.) par. 10, at 29. Therefore, pursuant to section 14(p), the Board ordered the parties to design a process for the resolution of this dispute, with any disagreements subject to the Board's compliance (5 ILCS 315/14(p) (West 2002)). Section 14(p) states that "[n]otwithstanding the provisions of [section 14] the employer and exclusive representative may agree to submit unresolved

- 7 -

disputes concerning wages, hours, terms[,] and conditions of employment to an alternative form of impasse resolution."  5 ILCS 315/14(p) (West 2002).

CMS filed a petition for judicial review of the Board's decision, and a question exists as to whether said petition was timely filed.  The Board and AFSCME each filed separate appellate briefs in support of the Board's decision.  Additionally, the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) and the Illinois Fraternal Order of Police Labor Council (IFO-PLC) each filed separate amicus curiae briefs in support of the Board's decision.

## II. ANALYSIS

### A. Timing

The Board argues that, as a threshold issue, this appeal should be dismissed because CMS's petition for direct review was not timely filed.  Parties proceeding before an administrative agency shall be barred from obtaining judicial review of the agency's decision if review is not sought within the time and in the manner provided by the statute.  735 ILCS 5/3-102 (West 2004); Rodriguez v. Sheriff's Merit Comm'n of Kane County, 218 Ill. 2d 342, 349-50, 843 N.E.2d 379, 382-83 (2006).  Section 11(e) of the Act states that any direct appeal should be filed within 35 days from the date that a copy of the decision sought to be reviewed was served upon the parties.  5 ILCS

315/11(e) (West 2002).  Because the term "service" is not defined by the Act, we must defer to section 3-113 of the Administrative Review Law, which provides in relevant part:

> "The method of service of the decision shall be as provided in the Act governing the procedure before the administrative agency, but if no method is provided, a decision shall be deemed to have been served either when a copy of the decision is personally delivered or when a copy of the decision is deposited in the United States mail ***."  (Emphasis added.)  735 ILCS 5/3-113 (West 2002).

Illinois precedent is clear that date of "service" means the date that the decision was mailed, not the date it was received. Rodriguez, 218 Ill. 2d at 351, 843 N.E.2d at 383.

Here, the Board issued its decision on December 21, 2005, and asserts that it mailed out its decision on the same day.  CMS received the decision on December 23, 2005.  CMS filed its petition on Friday, January 27, 2006, 37 days after the decision was mailed, but only 35 days after the date the decision was received.

CMS requests, however, that we find exception to the definition of service contained in section 3-113 because the Board's own regulations concerning the time limits set forth in

the _Act_ deem that "[s]ervice of a document upon a party by mail shall be presumed complete three days after mailing, if proof of service shows the document was properly addressed." 80 Ill. Adm. Code §1200.30(c) (Conway Green CD-ROM June 2003); see also 145 Ill. 2d R. 12 (also declining to label date of service as the date the document was mailed, stating that service by mail is complete four days after mailing). Case law supports CMS's request, and we agree.

Section 1200.30 was explicit in providing that its provisions applied "in computing any period of time prescribed by the Act." 80 Ill. Adm. Code §1200.30(a) (Conway Green CD-ROM June 2003). The Board concedes that case law has found that an administrative agency may, under its general authority to interpret its governing statutes, define "service" as occurring sometime after mailing, and that section 1200.30 was intended to change the statutory service provisions of section 3-113 of the Administrative Review Law. _Moren v. Department of Human Rights_, 338 Ill. App. 3d 906, 909, 790 N.E.2d 86, 88-89 (2003); _Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board_, 143 Ill. App. 3d 898, 903, 493 N.E.2d 1130, 1133-34 (1986) (Fourth District); _Water Pipe Extension, Bureau of Engineering, Laborers Local 1092 v. City of Chicago_, 195 Ill. App. 3d 50, 56, 551 N.E.2d 1324, 1326 (1990).

However, the Board contends that section 1200.30 applies only to in-Board proceedings, not to petitions for judicial review, and therefore is not applicable to the instant case. The Board argues that its 2004 amendment to the regulations, which added section 1200.3 (80 Ill. Adm. Code §1200.3 (added by emergency rulemaking at 28 Ill. Reg. 7529, eff. May 12, 2004)), now prohibits section 1200.30's application to external procedures, such as a petition for judicial review and that Moren, School District 202, and Local 1092 no longer apply. We disagree.

The amendment inserted a general policy statement, section 1200.3, preceding section 1200.30. 80 Ill. Adm. Code §1200.3 (added at 28 Ill. Reg. 15154, eff. November 1, 2004)). The general policy statement provided:

"The regulations contained in this Part detail the procedures that employers, employees[,] and labor organizations should use when filing petitions pursuant to parts 1210 [representation proceedings], 1220 [unfair labor charges,] and 1230 [impasse resolution], which implement the provisions of the Illinois Public Labor Relations Act ***." (Emphases added.) 80 Ill. Adm. Code §1200.3 (added at 28 Ill. Reg. 15154, 15160 (eff.

- 11 -

November 1, 2004)).
The Board asserts that the regulations contained in this part only apply to internal procedures following the amendment because section 1200.3 refers only to petitions filed under sections 1210, 1220, and 1230, which are all, according to the Board, internal procedures.

However, section 1200.30 is also contained in the "Part" to which section 1200.3 refers. Moreover, section 1200.30, the specific regulation concerning timing of service, remains unchanged and still explicitly states that the timing provision applies "any period of time prescribed by the Act or this Part." (Emphases added.) 80 Ill. Adm. Code §1200.30 (Conway Green CD-Rom June 2003). The timing of a petition for judicial review is a "period of time prescribed by the Act." As such, section 1200.30 should continue to apply to external procedures as dictated by case-law precedent. As stated in Moren, it would be "fundamentally unfair to penalize [the] petitioner for relying on procedural rules promulgated by the very agency from which [it] seeks judicial review." Moren, 338 Ill. App. 3d at 910, 790 N.E.2d at 89.

### B. Standard of Review

The Board concedes that this court should apply a de novo standard of review in evaluating the Board's determination that the Act authorized midterm interest arbitration. See Wilson

v. Department of Professional Regulation, 344 Ill. App. 3d 897, 907, 801 N.E.2d 36, 44 (2003) (de novo review of an administrative agency's decision is limited to matters involving statutory interpretation). However, the Board argues, and we agree, that, to the extent that there are any ambiguities, this court should give deference to the administrative agency's interpretation of the Act it was created to enforce. County of Will v. Illinois State Labor Relations Board, 219 Ill. App. 3d 183, 185, 580 N.E.2d 884, 885 (1991), citing City of Decatur v. American Federation of State, County, & Municipal Employees Local 268, 122 Ill. 2d 353, 361, 522 N.E.2d 1219, 1222 (1988). It is reasonable to defer to an agency's interpretation of its enabling statute because the agency presumably makes informed decisions based on its experience and expertise. County of Will, 219 Ill. App. 3d at 185, 580 N.E.2d at 885. Other courts have characterized this form of deference to the agency's interpretation as "relevant but not binding," stressing that de novo review still applies. Branson v. Department of Revenue, 168 Ill. 2d 247, 254, 659 N.E.2d 961, 965 (1995).

The issue of waiver turns on an application of the relevant law to the particular facts of the case. Specifically, we must ask whether the language in the bargaining agreement meets the "clear and unmistakable" standard for a party to a labor agreement's waiver of a statutory right. See American

- 13 -

Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board, 274 Ill. App. 3d 327, 334, 653 N.E.2d 1357, 1362 (1995) (regarding "clear and unmistakable" standard).  Where the Board's determination is best considered a mixed question of law and fact, the "clearly erroneous" standard of review is appropriate.  City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).

### C. Statutory Right to Interest Arbitration

The crux of CMS's argument on appeal is that the plain language of section 14, entitled "Security Employee, Peace Officer[,] and Fire Fighter Disputes," simply does not grant security employees the statutory right to the interest arbitration in order to resolve midterm interest disputes.  Before we go any further in discussing CMS's argument, we clarify that the Board did not hold that section 14 guaranteed security employees a right to immediate access to interest arbitration.  Rather, the Board held that section 14 authorizes midterm interest arbitration for security employees.

In applying provisions of a statute, our primary goal is to ascertain and give effect to the intent of the legislature, and the language of the statute itself is the best indicator of the legislature's intent.  See Price v. Philip Morris, Inc., 219 Ill. 2d 182, 242, 848 N.E.2d 1, 37 (2005).  CMS contends that

section 14's specific reference to initial and successor contracts without referencing midterm disputes means that section 14 does not cover midterm disputes.  The portions of section 14 to which CMS points in support of its argument state:

> "(a) In the case of <u>collective[-]bargaining</u> <u>agreements</u> involving units of security employees of a public employer, *** and in the case of disputes under [s]ection 18, unless the parties mutually agree to some other time limit, <u>mediation</u> <u>shall</u> <u>commence</u> <u>30</u> <u>days</u> <u>prior</u> <u>to</u> <u>the</u> <u>expiration</u> <u>date</u> <u>of</u> <u>such</u> <u>agreement</u> ***.  In the case of negotiations for <u>an</u> <u>initial</u> <u>collective[-]bargaining</u> <u>agreement</u>, <u>mediation</u> <u>shall</u> <u>commence</u> <u>upon</u> <u>15</u> <u>days</u> <u>notice</u> <u>from</u> <u>either</u> <u>party</u> ***.  If any dispute has not been resolved within 15 days after the first meeting of the parties and the mediator, or within some other time limit as may be mutually agreed upon by the parties, either [party] may request *** arbitration, and shall submit a copy of the request to the Board."  (Emphases added.)  5 ILCS 315/14(a) (West 2002).

And:

"(h) Where there is no agreement between the parties, or where there is an agreement but the parties have begun negotiations *** looking into a new agreement or amendment of the existing agreement, and the wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions and order upon the following factors, as applicable: ***."  (Emphasis added.)  5 ILCS 315/14(h) (West 2002) ("agreement" means a collective-bargaining agreement, not a settlement of terms).

(Also, it appears to be CMS's position that the term "amended agreement" refers to a "reopened" contract term, and not a midterm dispute.)  Contrary to CMS's assertion, the plain language of section 14 does not omit all references to midterm disputes.  Though section 14's references to midterm disputes are not as obvious as its references to initial and successor contracts or even to contract "reopeners," they are subtly present. For example, subsection 14(a) specifies that the dispute-resolution procedures delineated in section 14 (i.e., including interest arbitration) are available to section 18 disputes.  5 ILCS 315/14(a) (West 2002) ("In the case of collective[-]bargaining

[disputes] involving *** security employees *** and in the case of disputes under [s]ection 18").  Section 18 authorizes the courts to relegate employees who have the right to strike to resolve their disputes under section 14 procedure when the act of striking might present a clear and present danger to the public. 5 ILCS 315/18 (West 2002).  Because there is no statutory distinction between an employee's right to strike midterm and an employee's right to strike in support of its position regarding an initial or successor contract, section 14 authorizes the use of its procedures to employees who are potentially involved in a midterm dispute.

CMS supplements its "plain-language" argument with the contention that the interest-arbitration timetables set forth in section 14 are unworkable for resolution of midterm disputes. CMS notes that it could take over 170 days to resolve an ancillary issue, during which time the employer would be prohibited from changing any existing wages, hours, or other conditions of employment during the pendency of the arbitration proceeding.  5 ILCS 315/14(l) (West 2002).  This argument is ultimately unconvincing.  The timetable set forth in section 14 is directory, not mandatory.  See City of Seattle, Wash. Public Employment Relations Comm'n Decision, No. 1667-A (February 28, 1984) (recognizing the directory/mandatory distinction), available at http://www.perc.wa.gov/databases/ulp/1677-a.htm (last visited

- 17 -

April 13, 2007).  In fact, the Act specifically states that the parties may mutually agree to "some other time limit."  5 ILCS 315/14(a) (West 2002).  Also, it is important to remember that the Board's actual order in this case required the parties to design their own process for the resolution of the dispute, with any disagreements subject to the Board's compliance process.  5 ILCS 315/14(p) (West 2002).  Hence, the parties here were not bound by particular statutory time constraints.

State of Connecticut Office of Labor Relations v. Connecticut State Employees Ass'n, Connecticut State Board of Labor Relations Decision No. 2860 (October 30, 1990), which CMS cites, most plainly illustrates CMS's argument that the specific provisions of section 14 preclude midterm interest arbitration. The Connecticut labor board held that because the arbitration provision at issue specifically referenced initial and successor contracts, as well as contract "reopeners," but did not reference midterm disputes, the arbitration provision could not be interpreted to cover midterm disputes.  Connecticut, slip order at 6. Interestingly, shortly after the board came out with its decision in Connecticut, the Connecticut legislature added a clause to the arbitration provision that expressly provided for midterm interest arbitration.  See Conn. Pub. Act 91-290, eff. October 1, 1991 (adding section 5-276a(c) to the statute (see Conn. Gen. Stat. §5-276a(c) (1998)); State of Connecticut v. Connecticut Employees

<u>Union Independent, Inc.</u>, No. CV93-0704068 (October 22, 1993)
(unreported decision by Connecticut Superior Court judge implic-
itly affirming the board's determination that section 5-276a(c)
applied to certain midterm bargaining negotiations) (1993 Conn.
Super. LEXIS 2726). Additionally, we note that the labor board
in <u>Connecticut</u> failed to consider policy arguments that the
instant Act, as will be discussed below, requires us to consider.
Most basically, the <u>Connecticut</u> board did not consider the
specific arbitration provision in conjunction with a more general
policy clause.

Looking to the language of section 14 is not enough;
this court must evaluate the statute as a whole and, if possible,
construe it so that no term is rendered superfluous or meaning-
less. <u>Texaco-Cities Service Pipeline Co. v. McGaw</u>, 182 Ill. 2d
262, 270, 695 N.E.2d 481, 485 (1998). Section 2 of the Act,
entitled "Policy," also makes specific reference as to how
disputes involving security employees are to be resolved:

> "[A]ll collective[-]bargaining disputes in-
> volving persons *** defined herein as secu-
> rity employees shall be submitted to impar-
> tial arbitrators, who shall be authorized to
> issue awards in order to resolve such dis-
> putes. It is the public policy of the State
> of Illinois that <u>where the right of employees</u>

- 19 -

to strike is prohibited by law, it is neces-
sary to afford an alternate, expeditious,
equitable[,] and effective procedure for the
resolution of labor disputes subject to ap-
proval procedures mandated by this Act.  To
that end, the provisions for such awards
shall be liberally construed."  (Emphases
added.)  5 ILCS 315/2 (West 2002).

CMS argues that the general policy provisions of
section 2, indicating that "all" collective-bargaining disputes
should be resolved through arbitration, is in conflict with the
more specific provisions of section 14.  When interpreting
legislative intent, specific provisions control over the more
general provisions.  Knolls Condominium Ass'n v. Harms, 202 Ill.
2d 450, 459, 781 N.E.2d 261, 267 (2002).  However, the statutes
should be construed in harmony with each other if at all possible
so that no provisions are rendered inoperative.  Knolls, 202 Ill.
2d at 458-59, 781 N.E.2d at 267.

The key to harmonizing the two sections is that section
2 mandates "alternate, expeditious, equitable[,] and effective
procedure" for labor disputes where the employees who are prohib-
ited from striking "by law."  (Emphasis added.)  5 ILCS 315/2
(West 2002).  The phrase "alternate, expeditious, equitable[,]
and effective" is a statutorily mandated right. Section 2 makes

- 20 -

clear the legislature's intent that the <u>statutory</u> dispute-resolution rights of employees who do not have the <u>statutory</u> right to strike be commensurate with the right to strike.

In reaching impasse in a typical negotiation, an employer has the right to unilaterally implement its final offer and an employee has the right to strike in support of its bargaining demands. <u>Local Union No. 47 v. National Labor Relations Board</u>, 927 F.2d 635, 640 (D.C. Cir. 1991); <u>Hydrologics, Inc.</u>, 293 N.L.R.B. 1060, 1062 n.13, 131 L.R.R.M. 1350, 1353 n.10, citing <u>Speedrack, Inc.</u>, 293 N.L.R.B. 1054, 1055-56, 131 L.R.R.M. 1347 (1989). Providing each party with an economic weapon puts the parties on more equal footing. <u>Local Union No. 47</u>, 927 F.2d at 643, citing <u>National Labor Relations Board v. Lion Oil Co.</u>, 352 U.S. 282, 290-91, 1 L. Ed. 2d 331, 338-39, 77 S. Ct. 330, 335 (1957). However, employees who do not have the statutory right to strike, such as the security employees in the instant case, would not be on equal footing with the employer were the employer to implement its final offer upon reaching impasse. Such a result is not in line with the plain language of section 2, which states that it is necessary to provide employees who are statutorily prohibited from striking with an alternate and equitable means of resolving their disputes. The Act itself grants a general right to strike to non-section 14 employees and makes no distinction as to whether that right applies only to initial-

successor disputes or whether that right applies to midterm disputes. See 5 ILCS 315/17 (West 2002) (granting nonsection 14 employees a general right to strike). As such, the statutory dispute-resolution procedures of section 14, the only section detailing dispute-resolution procedures for section 14 employees, must cover midterm disputes as well as initial-successor disputes if said dispute-resolution procedures are to be alternate and equitable to the right to strike. See Seattle, Wash. Public Employment Relations Comm'n Decision No. 1667-A (using similar reasoning to determine that despite the statute's specific reference to initial and successor contracts only, the union was entitled to interest arbitration under the statute, if necessary, to resolve a midterm dispute upon reaching impasse in bargaining). As stated by the commission in Seattle, "[t]he balance of power would be tipped in favor of the employer by the [statutory provisions prohibiting striking], which clearly preclude the alternative of economic action [that] would have been available to [those employees with the right to strike]." Seattle, Wash. Public Employment Relations Comm'n Decision No. 1667-A (1984), slip order at 4. We will hereinafter call the argument that section 2 favors a statutory right to midterm interest arbitration in exchange for a statutory right to strike as the "right to strike" argument.

The only other case to consider the "right to strike"

- 22 -

argument, <u>Dane County</u>, Wis. Employment Relations Comm'n Decision No. 17400 (November 2, 1979), <u>affm'd</u> <u>sub</u> <u>nom.</u> <u>Dane County Special Education Ass'n v. Wisconsin Employment Relations Comm'n</u>, No. 80-CV-0097 (Wis. Cir. Ct. of Dane County, June 9, 1980), is distinguishable. The <u>Dane County</u> labor board found the "right to strike" policy argument (slip order at 9) "compelling," (slip order at 11) but stated that it would not even consider the policy argument where it found the statutory language to be clear (slip order at 11-12). The interest-arbitration provision in <u>Dane County</u>, as in the instant case, made express reference to initial and successor contracts only (slip order at 11).

However, the statutory language in <u>Dane County</u> more specifically excluded midterm interest arbitration. The <u>Dane County</u> statute contained parallel provisions, one concerning fact-finding procedures and one concerning interest-arbitration procedures. The fact-finding language encompassed midterm disputes and the interest-arbitration procedure did not mention midterm disputes. The Wisconsin labor board reasoned that where a section of a statute contains a particular provision, omission of the same provision in a similar section is significant to show different legislative intent for the two sections. <u>Dane County</u>, slip order at 11-12; see also for example, <u>Hamilton v. Conley</u>, 356 Ill. App. 3d 1048, 1056, 827 N.E.2d 949, 957 (2005). The instant statute contains no such parallel provisions.

- 23 -

Even more important, <u>Dane County</u> is not persuasive because, unlike the general policy statement in <u>Dane County</u>, which also promoted the peaceful resolution of labor disputes, the policy statement in the present case makes <u>express</u> <u>reference</u> to the potential imbalance between employees who do not have the right to strike and the employers with whom they are negotiating, stating that it is "necessary" to afford security employees access to an economic bargaining weapon that is qualitatively similar to the right to strike.  See 5 ILCS 315/2 (West 2002). This express language is indication enough that we, unlike the Board in <u>Dane County</u>, must consider the "compelling" "right to strike" policy argument.

CMS argues that the "right-to-strike" argument must fail here because finding that section 14 employees have a statutory right to midterm interest arbitration would afford section 14 employees <u>greater</u> rights than their nonsection 14 counterparts <u>in</u> <u>this</u> <u>case</u>.  This is a result that CMS deems contrary to the policy statement contained within section 2, mandating that section 14 employees receive alternate and equitable procedure for dispute resolution.  A careful reading of section 2, however, shows that section 2 states that the statutory dispute-resolution rights to be granted to security employees are to be alternate to the right to strike itself, not necessarily alternate to the rights afforded to other employees.

See 5 ILCS 315/2 (West 2002). As discussed in Local Union No. 47, the rationale behind the right to strike is to put employees on equal footing with employers, and it is therefore logical to infer that any statutory alternative to the right to strike is also meant to facilitate good-faith negotiations between employers and employees. Local Union No. 47, 927 F.2d 635, 642-43.

We nevertheless address CMS's argument that allowing security employees midterm interest arbitration under the Act would improperly give security employees greater rights than nonsection 14 employees. CMS notes that the bargaining agreement relevant here contains a general no-strike provision that is applicable to all employees, both security employees that are statutorily prohibited from striking and nonsection 14 employees. CMS seems to imply that, in this case, nonsection 14 employees are also statutorily prohibited from striking. See 5 ILCS 315/17 (West 2002). Section 17, entitled "Right to Strike," states that nonsection 14 employees generally have a statutory right to strike so long as the existing bargaining agreement does not prohibit the strike and so long as the existing bargaining agreement does not contain a final and binding arbitration provision. 5 ILCS 315/17 (West 2002). Admittedly, the bargaining agreement here contains both a no-strike clause and a grievance-arbitration provision. As such, CMS argues that finding security employees have the right to midterm interest

arbitration in certain situations, while simultaneously finding that nonsection 14 employees do not have the right to strike, affords security employees <u>greater</u> rights than nonsection 14 employees.

However, whether the nonsection 14 employees covered by the bargaining agreement may be statutorily prohibited from striking <u>in</u> <u>this</u> <u>case</u> is of no import. As will be discussed further in the waiver section of this analysis, the no-strike <u>contractual</u> <u>clause</u> was not statutorily mandated. See 5 ILCS 315/8 (West 2002) (stating the parties have an option, upon mutual agreement, to forgo a no-strike clause in the bargaining agreement). The fact that security employees maintain a statutory right to access midterm interest arbitration while nonsection 14 employees lose the statutory right to strike that prompted the legislature to give security employees the right to interest arbitration in the first place results from the interplay between section 17 of the statute and the unique terms of the particular contract at issue here. This interplay between statute and a specific contract should not negate a general statutory right; rather, said interplay between contract and statute is a question more appropriate for a waiver analysis.

D. Waiver of Statutory Right to Interest Arbitration

CMS next contends that even if section 14 security employees have the statutory right to demand midterm interest

arbitration, then the security employees have waived those rights in the bargaining agreement. The contractual waiver of a statutory right in a labor agreement must be "clear and unmistakable." American, 274 Ill. App. 3d at 334, 653 N.E.2d at 1362. The language of the contract must evince an "unequivocal intent" to relinquish the relevant statutory right; waiver is never presumed and the language sustaining the waiver must be specific. American, 274 Ill. App. 3d at 334, 653 N.E.2d at 1362. In support of its waiver argument, CMS points to the bargaining agreement's no-strike clause and its facilities-closure clause.

As stated above, the bargaining agreement contained a no-strike clause, which prohibited all employees, both section 14 and nonsection 14, from striking. As a statutorily mandated tradeoff to the no-strike clause, the bargaining agreement also contained a grievance-arbitration provision. See 5 ILCS 315/8 (West 2002). Section 8 of the Act states that, unless mutually agreed otherwise, the bargaining agreement shall contain a grievance resolution procedure that shall apply to all employees in the bargaining unit and shall provide for final and binding arbitration of disputes concerning the administration or interpretation of the bargaining agreement. Section 8 also provides that whenever a bargaining agreement contains a final and binding arbitration provision, it shall also contain a provision prohibiting strikes for the duration of the agreement. 5 ILCS 315/8

- 27 -

(West 2002); <u>City of Decatur</u>, 5 Pub. Employee Rep. (Ill.) par 2008, No. S-CA-88-92, at X-87 (Illinois State Labor Relations Board 1989). The rationale behind this tradeoff is to ensure that negotiations proceed in good faith by keeping the parties on even footing in the face of impasse. In other words, where the contract takes away a party's right to strike in support of its bargaining position, the contract also provides that party with an alternative means of resolution, preventing the employer from unilaterally implementing its final offer before utilizing mediation and arbitration procedures.

Contrary to CMS's assertion, the coterminous no-strike clause and grievance-arbitration clause do not require this court to find that the security employees have waived their statutory right to interest arbitration, nor do they require that this issue be resolved through contractually authorized grievance-arbitration procedures. Such a result would only be tenable if a security employee's <u>statutory</u> right to interest arbitration was somehow inversely dependent upon a nonsection 14 employee's <u>contractual</u> waiver of the statutory right to strike. We have already held this is not the case. The mere fact that there was a relationship between the legislature's intent in enacting two different statutory rights (here the right to interest arbitration and the right to strike), for two different groups of employees (here security employees and nonsection 14 employees),

does not mean that one group's contractual waiver of its respective statutory right results in the other group's contractual waiver of its statutory right. The fact that nonsection 14 employees have given up their right to strike in exchange for grievance-arbitration procedures does not mean that security employees have waived their statutory right to interest arbitration.

The bargaining agreement also contained a facilities-closure clause, contained in a memorandum of understanding in the bargaining agreement's appendix, which stated as follows:

> "It is understood by the parties that within sixty (60) days of the [e]mployer's announcement of the closure or conversion of a facility ***, the parties agree to negotiate over such matters that may impact upon employees covered by this agreement on questions of wages, hours[,] and other conditions of employment." (Emphasis added.)

According to CMS, the significance of this clause is that it gives the state a right to close a facility and obligates CMS to bargain over the impact of such closures but is silent as to how the parties would resolve impact bargaining if a voluntary agreement was not reached. CMS notes that, as evidenced by article XXXIV, section 4, in the bargaining agreement, entitled

- 29 -

"Waiver," AFSCME had unlimited right and opportunity to make demands and proposals on any subject of collective bargaining. One of those demands and proposals was the memorandum of understanding concerning facility closures quoted above. CMS notes that AFSCME had the opportunity to reference statutory interest arbitration in that memorandum and it did not. CMS argues that by agreeing to impact bargaining on facility closures, without more, the parties have agreed to apply the normal procedures with respect to impact bargaining--that when the parties reach impasse, the employer may unilaterally implement its final offer. CMS argues that because the collective-bargaining agreement did not specifically include a clause stating that the parties had a right to go to interest arbitration under the statute, the dispute could only be covered under the jurisdiction of the contract's grievance-arbitration procedure.

There are three problems with this argument. First, there is no rule that a party has to affirmatively name a statutory right in a contract in order to preserve that statutory right. See American, 274 Ill. App. 3d at 334, 653 N.E.2d at 1362. Second, CMS's two conclusions, that CMS has a right to implement its final offer upon reaching impasse and that the dispute at issue here could only be covered under the contract's grievance-arbitration procedure, are inconsistent with one another. The contractual grievance-arbitration procedure does

- 30 -

not provide for implementation of a final offer upon impasse. Rather the grievance-arbitration procedure dictates that parties resolve disputes through the lowest level of grievance procedure possible, advancing up "steps" of grievance procedure upon failing to come to a resolution, ultimately allowing for binding arbitration procedures if the parties complete the requisite steps. Third, while the dispute at issue may very well have been resolved under the contractual grievance-arbitration procedures, the parties in this case have stipulated that there was no issue of deferral to the grievance-arbitration procedures. In Spokane County, No. 12105-U-95-2853 Wash. Public Employment Relations Comm'n Decision No. 5698 (October 9, 1996) (deferral does not mean loss or surrender of jurisdiction) (1996 WL 686780, at *5), the Commission stated that even where a dispute involving unilateral change is arguably covered by the grievance-arbitration procedure in the existing bargaining agreement, and therefore may be most rightfully be deferred to the grievance-arbitration procedures, a commission still has jurisdiction over such matters.

Even if CMS's argument were meritorious as to an implicit waiver of the statutory right to interest arbitration, CMS is still unable to meet the applicable waiver standard in Illinois. The employees at issue here have not "clearly and unmistakably" waived their right to interest arbitration. As

stated by the Board, the no-strike clause does not even reference interest arbitration, let alone a waiver of interest arbitration. Nothing in the bargaining agreement explicitly states that section 14 employees, or any employees for that matter, waive their statutory right to interest arbitration.

Accordingly, the security employees have not contractually waived their statutory right to access midterm interest-arbitration procedures authorized by the Act.

### III. CONCLUSION

For the aforementioned reasons, we affirm the Board's decision and order.

Affirmed.

KNECHT and TURNER, JJ., concur.