2024 IL App (1st) 221924-U
No. 1-22-1924

FIRST DIVISION
October 28, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| CITY OF PARK RIDGE, | ) | On Petition for Direct |
| | ) | Administrative Review of an |
| Petitioner-Appellant, | ) | Order of the Illinois Labor |
| | ) | Relations Board, State |
| v. | ) | Panel |
| | ) | |
| ILLINOIS LABOR RELATIONS BOARD, | ) | Charge No. S-CA-19-079 |
| STATE PANEL, and PARK RIDGE FIRE | ) | |
| FIGHTERS, INTERNATIONAL ASS'N | ) | |
| OF FIRE FIGHTERS, LOCAL 2697, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:* (1) the shift trade qualification policy was a mandatory subject of bargaining; (2) the Union did not waive its right to bargain over the qualifications for shift trades; and (3) the City's unilateral change of the shift trade qualification policy without giving notice and opportunity to bargain the change violated sections 10(a)(1), 10(a)(4), and 14(l) of the Illinois Public Labor Relations Act since the change occurred during interest arbitration.

¶ 2    The City of Park Ridge ("City or Department") appeals the Illinois Labor Relations Board's ("Board") final administrative decision which determined that the City violated sections 10(a)(1), 10(a)(4), and 14(l) of the Illinois Public Labor Relations Act ("Act"). The City argues that that

the Board's decision is clearly erroneous. Specifically, it argues that the new shift trade qualifications policy is not a mandatory subject of bargaining, as it was within the City's inherent managerial authority and the burden of bargaining outweighs the benefits. The City also contends that the Union waived its right to bargain over shift trade qualifications. We affirm.

¶ 3                                                       BACKGROUND

¶ 4        The Park Ridge Fire Fighters, International Association of Fire Fighters, Local 2697 ("Union") and the City were parties to a collective bargaining agreement ("CBA") with a term of May 1, 2018, through April 30, 2021. Prior to their most recent CBA, they were parties to a preceding CBA with a term of May 1, 2014, through April 30, 2018. Both CBAs contained section 10.6 which detailed the shift trade policy:

> "An employee may request to trade shifts with another employee who is qualified to perform his duties. An employee may request a trade of a leave day, excluding sick leave, that was scheduled under Section 9.5(a)-(c) with another bargaining unit employee on the same shift. Employees should give as much notice as possible. The approval of shift trades, including leave day trades, is within the sole discretion of the Fire Chief or the Chief's designated representative. If a trade has been approved, the employee who accepts the shift trade (not the employee who requested the shift trade) shall be responsible for working on that day or finding a qualified replacement. In the event a requested shift trade is denied, the denial may be appealed under the grievance procedure set forth in this Agreement; provided, however, that said grievance may only be processed to Step 2 of the procedure and the City's Step 2 answer shall be final."

¶ 5        Additionally, since 1993, section 200.06 of the Department's policy manual established its shift trade policy. Section 200.06 stated that "Shift Trades are permitted on a case-by-case basis as a convenience for the members of the department realizing that the scheduling required in the fire service makes regular personal activities difficult to arrange." A battalion chief or acting battalion chief must approve a shift trade. In cases where the staffing situation was uncertain or there were other operational concerns, a battalion chief or acting battalion chief could withhold

approval. Section 200.20 established the Department's acting lieutenant requirements. The policy contained five tiers which prioritize who would be selected to act as the lieutenant if the actual lieutenant was not there that day. The first two tiers included firefighters who were on the promotional list. Tiers three through five included firefighters who were not on the promotional list but had five years of experience with the fire department and various levels of training.

¶ 6        On approximately March 15, 2018, the Union and the City jointly submitted a request for mediation panel with respect to negotiations for the successor contract to the 2014-2018 CBA. The parties finalized the successor CBA in March and April 2019. On November 4, 2018, Lieutenant/Paramedic John Ortlund ("Ortlund") submitted a shift trade request, pursuant to which Firefighter/Paramedic Zivko Kuzmanovich ("Kuzmanovich") would cover his shift on December 25, 2018. Battalion Chief Scott Sankey ("Sankey") approved the trade. However, Fire Chief Jeff Sorenson ("Sorensen") instructed Sankey to cancel the trade. In December 2018, Sorenson decided that individuals who were on the promotional list were the only individuals who were qualified to trade shifts with lieutenants. Kuzmanovich was not on the promotional list. Sorenson also decided that non-paramedic firefighters were no longer qualified to trade shifts with paramedics. For the past 25 years, non-paramedic firefighters could trade with paramedics and firefighters who qualified to act as lieutenants pursuant to section 200.20 could trade with lieutenants. Ortlund filed a grievance over the cancellation of his shift trade.

¶ 7        About a month later, the Union filed a charge with the Board, alleging that the City violated sections 10(a)(1), 10(a)(4), and 14(l) of the Act (5 ICLS 315/*et seq.* (West 2018)). Specifically, the Union alleged that without notice or bargaining the City unilaterally changed its policy regarding shift trades while contract negotiations were ongoing and during the pendency of interest arbitration proceedings. An evidentiary hearing followed.

¶ 8                                    A. Evidentiary Hearing

¶ 9            At the hearing, Union Vice President Brian Pavone ("Pavone") testified that he worked as a fire fighter/paramedic for the Department since 2000. Pavone compiled Union Exhibit 2 which included the roster sheets for the 73 days during 2018 on which shift trades occurred. Pavone stated that the reason he compiled Union Exhibit 2 was to show that the fire department was fully functional with allowing out-of-class shift trades. Pavone also compiled Union Exhibit 3. He stated that he compiled Union Exhibit 3 to show that in 2018, the fire department required individuals who were not on the promotional list to act as lieutenants. In 2021, the Department continued this practice after Sorenson changed the shift trade qualifications policy. Prior to December 2018, Pavone never heard of a shift trade being denied for any reason other than an injury to one of the individuals requesting the trade.

¶ 10           Battalion Chief Ortlund testified that he worked for the fire department for 27 years. Throughout his career, he traded shifts between 15 to 30 times a year. As a firefighter/paramedic, he traded with firefighters that were not paramedics. Once he qualified to act as a lieutenant, he traded with lieutenants. Qualified meant amount of time on the job and some level of education. He was not required to be on the lieutenant promotional list to trade with lieutenants. Ortlund testified that the only limitation on trades was the number of paramedics required to maintain operational readiness. A trade could be denied if it impacted the City's ability to operate.

¶ 11           Ortlund testified that "the requirement to trade with an officer had progressed over the years" and "had been negotiated and agreed upon***." The CBA was consistent with Ortlund's understanding of the shift trade qualification policy. From 2017 to 2019, when Ortlund served as the Union president, Sorenson never informed him that he planned to change the policy. Ortlund informed Sorenson that he preferred to have two paramedics assigned to a rescue vehicle when

availability allowed. Ortlund did not believe that section 10.6 of the CBA allowed the fire chief to establish which employees were qualified to trade shifts.

¶ 12        Acting Union President Wedge Lazenby ("Lazenby") testified that he worked for the fire department for 23 years. Lazenby testified regarding section 200.20 of the Department's policy manual. Section 200.20 established the City's acting lieutenant requirements. The policy contained five tiers which prioritize who would be selected to act as the lieutenant if the actual lieutenant was not there that day. The first two tiers included firefighters who were on the promotional list. Tiers three through five included firefighters who were not on the promotional list but had five years of experience with the fire department and various levels of training. Lazenby testified consistently with Ortlund regarding his experience and his understanding of the shift trade policy. Lazenby expected the fire department to eventually bargain to phase out non-paramedic firefighters. While bargaining the then-current CBA, the City did not propose changing the shift trade qualifications policy.

¶ 13        Sorenson testified that he worked for the Department for 24 years. The Department operated two fire stations: Station 35 and Station 36. Station 35 contained two vehicles: Ambulance 35 and Engine 35. Station 36 contained four vehicles: Battalion 36, Ambulance 36, Tower 36, and Rescue 36. The Department was required to maintain two paramedics per ambulance and one paramedic per vehicle with advance life support ("ALS") capabilities. Engine 35, Tower 36, and Rescue 36 each required at least one firefighter/paramedic per vehicle, but Sorenson preferred two. Sorenson admitted that since he changed the shift trade qualification policy the Department still staffed only one paramedic per ALS capable vehicle on occasion.

¶ 14        The Department operated three shifts with a 24-hour duration and 16 personnel scheduled per shift. Each shift consisted of one battalion chief, two lieutenants, and a combination of

firefighter/paramedics and firefighters. Sorenson testified that it was rare that 16 people worked a shift because of vacations, injuries, illnesses, and vacancies. The fire department always had at least 11 people on duty. The CBA provided for ten bargaining unit members on duty.

¶ 15    Sorenson recognized that the Department allowed bargaining unit members to request shift trades since before he joined it. Additionally, he stated that the "sole discretion" language of section 10.6 in the CBA had been in the CBA for a long time. He did not remember it not being in the CBA. He believed that the fire chief determined the shift trade qualifications.

¶ 16    Sorenson stated that the Department had 46 bargaining unit members. The CBA required that at least 27 bargaining unit members maintained their paramedic licenses. Any bargaining unit member that completed ten years of service could drop their paramedic license subject to the 27 minimum requirement. Additionally, the minimum number of lieutenant paramedics required was seven. In total, the CBA allowed 12 bargaining unit members to allow their paramedic licenses to lapse. Between 2016 and 2021, the number of non-paramedic firefighters fluctuated between three and six. Sorenson admitted that those numbers enabled the Department to staff the various vehicles with enough paramedics. Still, he believed that if more than six bargaining unit members allowed their paramedic licenses to lapse, it could cause a problem.

¶ 17    Regarding acting lieutenants trading shifts with lieutenants, Sorenson stated that he was concerned that the person acting as a lieutenant might not be the best choice on a certain day or might be someone the battalion chief had concerns about. The Department could pay an extra stipend to a different person to complete the trade. Sorenson believed that the promotional list was a fair way over determining who was qualified to act as a lieutenant and trade shifts with lieutenants. He also agreed that the Department's acting lieutenant policy established the minimum requirements for someone to act as a lieutenant. Further, he admitted that since he changed the

shift trade qualifications policy the Department still required individuals who were not on the promotional list to act as lieutenants.

¶ 18                                B. ALJ and Board Decision

¶ 19        The administrative law judge ("ALJ") determined that the City violated sections 10(a)(4), 10(a)(1), and 14(l) of the Act by making a unilateral change to a mandatory subject of bargaining without first bargaining it to impasse or agreement during the pendency of interest arbitration proceedings.

¶ 20        The ALJ determined that there was no dispute that the City unilaterally changed the qualifications for shift trades. Qualifications for shift trades were a mandatory subject of bargaining. The qualifications for shift trades clearly impacted the hours an employee worked and the hours that they had off work. The evidence failed to establish that the qualifications for shift trades were a matter of inherent managerial authority. Regardless, the evidence failed to establish any burden that bargaining would impose on the City since the prior practice of allowing out-of-class trades existed for 25 years. Further, the City could have bargained to increase the minimum number of paramedics but did not do so.

¶ 21        The ALJ also found that section 10.6 of the CBA did not constitute a waiver. Section 10.6 did not contain any express language regarding qualifications for shift trades. Notably, the CBA did not define "qualified". The ALJ also determined that the City violated the status quo during interest arbitration proceedings. The ALJ concluded that the 25-year practice of allowing out-of-class shift trades constituted the status quo.

¶ 22        The Board accepted the ALJ's findings and recommendations. The City appealed.

¶ 23                                ANALYSIS

¶ 24    On appeal, the City argues that the Board's decision is clearly erroneous. Specifically, it argues that the new shift trade qualifications policy is not a mandatory subject of bargaining, as it was within the City's inherent managerial authority and the burden of bargaining outweighs the benefits. The City also argues that the Union waived its right to bargain over shift trade qualifications. Moreover, the City contends it did not violate the Act.

¶ 25                                    A. Standard of Review

¶ 26    Judicial review of the Board's decision is governed by the Administration Review Law. 735 ILCS 5/3-101 *et seq.* (West 2018); *Northwest Mosquito Abatement Dist. v. Illinois State Labor Relations Bd.*, 303 Ill. App. 3d 735, 741 (1st Dist. 1999). The scope of judicial review extends to all questions of law and fact presented by the record. 735 ILCS 5/3-110 (West 2018). "The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Service, Inc. v. Dep't of Employment Security*, 198 Ill. 2d 380, 390 (2001).

¶ 27    "An administrative agency's findings of fact are not reversed unless they are against the manifest weight of the evidence, and questions of law are reviewed *de novo*. [Citation.]" *Lyon v. Dep't of Children and Family Services*, 209 Ill. 2d 264, 271 (2004). Agency decisions that present a mixed question of law and fact are reviewed under a "clearly erroneous" standard, under which an agency decision "will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.'" *AFM Messenger Service,* 198 Ill. 2d at 395.

¶ 28    Here, the parties agree that our review of the Board's determination that the shift trade qualifications policy was a mandatory subject of bargaining and its determination that the

unilateral change of the shift trade qualifications policy constituted an unfair labor practice is subject to the clearly erroneous standard of review because it represents a mixed question of fact and law. *See Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Bd.*, 224 Ill. 2d 88, 95-98 (2007).

¶ 29　　　　However, the City argues that the Board's determination of whether the Union waived its right to bargain is subject to a *de novo* standard of review since the question of waiver depends solely on interpretation of the CBA. "The issue of waiver turns on an application of the relevant law to the particular facts of the case." *State, Dept. of Cent. Management Services (Department of Corrections) v. State Labor Relations Bd., State Panel*, 373 Ill. App. 3d 242, 249-50 (4th Dist. 2007). "Specifically, we ask whether the language in the bargaining agreement meets the 'clear and unmistakable' standard for a party to a labor agreement's waiver of a statutory right." *Id.* at 250. Accordingly, the "clearly erroneous" standard is appropriate. *Id.* (quoting *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998)).

¶ 30　　　　　　　　　　B. Mandatory Subject of Bargaining

¶ 31　　　　On appeal, the City contends that the new shift trade qualifications policy is not a mandatory subject of bargaining, as it was within the City's inherent managerial authority and the burden of bargaining outweighs the benefits.

¶ 32　　　　An employer violates sections 10(a)(1) and 10(a)(4) and commits an unfair labor practice when it refuses to bargain in good faith with a labor organization that is the exclusive representative of a bargaining unit of public employees. 5 ILCS 315/10(a)(1), (a)(4) (West 2018). Section 7 of the Act requires parties to bargain with respect to employees' wages, hours and other conditions of employment, that is, with mandatory subjects of bargaining. *Id*. § 7; *Forest Preserve District of Cook County v. Illinois Labor Relations Board*, 369 Ill. App. 3d 733, 751-52 (1st Dist. 2006). "The

duty to collectively bargain in good faith under the Act extends to issues that arise during the term of a collective bargaining agreement." *County of Cook v. Illinois Labor Relations Board*, 2017 IL App (1st) 153015, ¶ 42.

¶ 33    We determine whether a matter is a mandatory subject of bargaining by applying the balancing test set forth in *Central City Education Ass'n v. Illinois Education Labor Relations Board*, 149 Ill. 2d 496 (1992). "The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment." *Central City Education Ass'n*, 149 Ill. 2d at 523. "If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain." *Id.* In determining whether the first prong of the *Central City* test has been fulfilled, we must determine if the change of the shift trade qualifications policy "(1) involved a departure from previously established operating practices, (2) effected a change in the conditions of employment, or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit." *Chicago Park Dist. v. Illinois Labor Relations Bd., Local Panel*, 354 Ill. App. 3d 595, 560 (1st Dist. 2004).

¶ 34    Here, the City does not dispute that the shift trade qualification policy involved "wages, hours and terms and conditions of employment." *Id*. We accept the City's concession since Sorenson's change of the shift trade qualifications policy concerned the hours an employee worked and the hours they could take off. The change of the policy also departed from a 25-year practice of allowing out of class shift trades.

¶ 35    If the answer to the first question is yes, then the second question is whether the matter is one of inherent managerial authority. *Id*. "To satisfy the second prong of analysis, the employer has the burden to link the objective of the challenged policy with a core managerial right." *County of Cook*, 2017 IL App (1st) 153015, ¶ 56. Section 4 of the Act states:

> "Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4 (West 2018).

"This statutory list is not exhaustive, but it establishes the characteristics of managerial rights that are not subject to mandatory bargaining." *Fraternal Order of Police, Chicago Lodge No. 7 v. Illinois Labor Relations Bd. Local Panel*, 2011 IL App (1st) 103215, ¶ 23. Inherent managerial authority is further defined as those matters residing at the core of entrepreneurial control. *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Bd.*, 224 Ill. 2d 88, 97 (2007). Step two of the test addresses only whether shift trade qualifications actually affect inherent managerial authority. *Id*. at 105.

¶ 36 The City argues that the qualifications for shift trades impacts the inherent management right to provide appropriate level of services for the community. That is, the City suggests Sorenson needed to be able to restrict who could request shift trades so that there were adequate paramedics/lieutenants available at any given time.

¶ 37 However, this justification for Sorenson's restrictions is undermined by the City's actual practices. Following the change to the qualifications policy, the City still required firefighters who were not on the promotional list to act as a lieutenant. Sorenson acknowledged that these situations took place after he changed the policy. Pavone's testimony established that the fire department was fully functional when out-of-class trades were permitted. Accordingly, the City's conduct of ignoring the new restrictions undermines its suggestion that they were necessary in the first place to meet the community's needs. This belies its assertion that the restrictions fall within the scope of inherent managerial authority.

¶ 38    Regarding shift trades between paramedics and non-paramedics, Sorenson believed that if the fire department had more than six non-paramedic firefighters it could create a problem. However, Sorenson acknowledged that from 2016 through 2021 the number of non-paramedic firefighters fluctuated between three and six. The parties also agreed that there was a minimum number of paramedics required to maintain operation readiness. Sorenson admitted that since he changed the shift trade qualification policy that the Department still staffed only one paramedic per ALS capable vehicle on occasion which met the minimum required number of paramedics but did not satisfy his preference for two paramedics which led to the change of the policy. Ortlund and Lazenby agreed that the Department could deny a shift if it negatively impacted the City's ability to maintain operational readiness. Thus, the Department was able to provide an appropriate number of paramedics and maintain operational readiness prior to the change in the shift trade qualifications policy. Further, after the change in the policy, Sorenson was still unable to maintain the number of paramedics that he preferred per shift. Allowing a non-paramedic firefighter to request a trade with a paramedic does not affect the Department's ability to provide an appropriate level of services for the community.

¶ 39    The evidence failed to establish that the qualifications for shift trades actually affected the City's ability to provide appropriate level of services for the community. *Board of Trustees of University of Illinois*, 224 Ill. 2d at 105 (step two of the *Central City* test is not a question of how core managerial rights may be indirectly affected but whether the rights are actually affected). Since we determined that the issue of qualifications for shift trades is not one of inherent managerial authority, the issue is a mandatory subject of bargaining, and our inquiry ends. *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 97 ("If the issue does not involve the employer's inherent managerial authority, then it is subject to mandatory bargaining.").

¶ 40    Even if the changes to the shift trade qualifications policy was within the City's inherent managerial authority, the City failed to establish that the burdens of bargaining outweigh the benefits. The third prong of the *Central City* test asks the Board to "balance the benefits that bargaining will have on the decisionmaking process with the burden that bargain imposes on the employer's authority." *Central City Education Ass'n*, 149 Ill. 2d at 523. The City argues that the record contains no evidence of proposals that would satisfy Sorenson's desire to have more paramedics and acting lieutenants. Contrary to the City's assertion, Pavone's testimony established a simple solution to Sorenson's concerns. The City could bargain to phase-out non-paramedic firefighters. Further, the CBA required seven lieutenants. Applying the same logic, the City could bargain to increase the number of lieutenants, or the number of firefighters required to meet the qualifications to remain on the promotional list. Additionally, the City failed to establish a burden since it previously allowed out-of-class trades for a period of 25-years.

¶ 41    Accordingly, the Board did not err when it determined that shift trade qualifications were a mandatory subject of bargaining.

¶ 42                              C. Waiver

¶ 43    The City argues that section 10.6 of the CBA established "clear and unmistakable" evidence that the Union waived its right to bargain over shift trade qualifications.

¶ 44    "Evidence that a party to a labor agreement intended to waive a statutory right must be clear and unmistakable." *Village of Oak Park v. Illinois State Labor Relations Bd.*, 168 Ill. App. 3d 7, 20 (1st Dist. 1988). "The language sustaining the waiver must be specific; waiver is never presumed." *American Federation of State County and Mun. Employees v. State Labor Relations Bd.*, 274 Ill. App. 3d 317, 334 (1st Dist. 1995).

¶ 45    Section 10.6 of the CBA stated:

> "An employee *may request to trade shifts with another employee who is qualified to perform his duties*. An employee may request a trade of a leave day, excluding sick leave, that was scheduled under Section 9.5(a)-(c) with another bargaining unit employee on the same shift. Employees should give as much notice as possible. *The approval of shift trades, including leave day trades, is within the sole discretion of the Fire Chief or the Chief's designated representative*. If a trade has been approved, the employee who accepts the shift trade (not the employee who requested the shift trade) shall be responsible for working on that day or finding a qualified replacement. In the event a requested shift trade is denied, the denial may be appealed under the grievance procedure set forth in this Agreement; provided, however, that said grievance may only be processed to Step 2 of the procedure and the City's Step 2 answer shall be final." (Emphasis added.)

The City emphasizes the "sole discretion" language and argues that it was Sorenson's sole discretion to determine the qualifications for shift trades. We disagree. The "sole discretion" language modifies "approval of shift trades." Thus, Sorenson has the sole discretion to approve or deny a trade. The CBA did not contain any express language regarding the qualifications for shift trades nor did it define the term "qualified." Based on our reading of section 10.6, an employee must first be qualified to perform the duties of another employee before they can even request to trade shifts. Then once the request is made, Sorenson has sole discretion to approve or deny the request. Contrary to the City's reading of section 10.6, the determination of qualifications comes before the trade request is submitted to Sorenson.

¶ 46    Accordingly, the Board did not err by determining that section 10.6 did not constitute a "clear and unmistakable" waiver of the Union's right to bargain over shift trade qualifications.

D. Violations of Sections 10(a)(1), 10(a)(4), and 14(l) of the Act

¶ 47    Since we determined that shift trade qualifications were a mandatory subject of bargaining and that the Union did not waive its right to bargain over this subject, we also conclude that the City violated sections 10(a)(1) and 10(a)(4) of the Act since it is undisputed that the City unilaterally changed the shift trade qualification policy without giving notice and an opportunity

to bargain the change. *Amalgamated Transit Union v. Illinois Labor Bd.*, 2017 IL App (1st) 160999, ¶ 35 (An employer violates sections 10(a)(1) and 10(a)(4) when it makes a unilateral change in a mandatory subject of bargaining without giving the union notice and an opportunity to bargain).

¶ 48    The parties agree that if the City made this unilateral change while the parties were engaged in interest arbitration, it violated section 14(l) of the Act. *See* 5 ILCS 315/14(l) (West 2018). The City further concedes that if that the shift trade qualifications were a mandatory subject of bargaining and that the Union did not waive its right to bargain over this subject, it violated section 14(l) of the Act. Here, the parties began interest arbitration in March 2018. Sorenson unilaterally changed the shift trade qualifications policy in December 2018. Since the parties did not finalize the successor CBA until March and April 2019, the unilateral change occurred during interest arbitration.

¶ 49    The Board did not err when it determined that the City violated sections 10(a)(1), 10(a)(4), and 14(l) of the Act.

¶ 50                                    CONCLUSION

¶ 51    For the reasons stated above, the decision of the Illinois Labor Relations Board is affirmed.

¶ 52    Affirmed.